[No. S088116. Aug. 16, 2001.]

CECELIO LUGTU et al., Plaintiffs and Appellants, v.
CALIFORNIA HIGHWAY PATROL et al., Defendants and Respondents.

## COUNSEL

Law Office of Steven W. O'Reilly, Charles B. O'Reilly, Steven W. O'Reilly; Haight, Brown & Bonesteel and Rita Gunasekaran for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Pamela Smith-Steward, Chief Assistant Attorney General, Margaret A. Rodda, Assistant Attorney General, Kristin G. Hogue and Karen M. Walter, Deputy Attorneys General, for Defendants and Respondents.

## Opinion

**GEORGE, C. J.**—Plaintiffs, passengers in an automobile that had been pulled over by a California Highway Patrol officer into the center median strip of a highway for a traffic violation, were injured when a pickup truck ran into their automobile from behind, while the automobile was stopped in the median strip. Plaintiffs thereafter filed this personal injury action against (1) the driver of the pickup truck, (2) the driver of the automobile in which they were riding, and (3) the California Highway Patrol (CHP) and the CHP officer who had directed their vehicle to stop in the center median, alleging that each defendant had been negligent and bore some legal responsibility for plaintiffs' injuries.

Prior to trial, the CHP and the CHP officer—the only defendants involved in the appeal now before us (hereafter generally referred to simply as defendants)—filed a motion for summary judgment, contending that plaintiffs' action against them should be dismissed on the ground, among others, that the CHP officer owed no legal duty of care to plaintiffs. After the parties filed declarations and counterdeclarations (including a copy of portions of the applicable CHP Officer Safety Manual), the trial court granted summary judgment in favor of defendants, based in part upon its determination that the CHP officer "had no duty to stop plaintiffs on the right shoulder as a matter of law and there is no triable issue of fact as to whether [the officer] acted with due care or whether his conduct was a legal cause of plaintiffs' injuries."

On appeal, the Court of Appeal reversed, concluding that the CHP officer owed plaintiffs a legal duty of reasonable care when he directed the driver of the automobile in which they were riding to stop in a particular location, and that triable issues of material fact exist as to whether the officer acted with reasonable care and whether his alleged negligence was a legal cause of plaintiffs' injuries.

We granted review to consider the issues presented. As we shall explain, the governing precedents clearly establish that a law enforcement officer, in directing a traffic violator to stop in a particular location, has a legal duty to use reasonable care for the safety of the persons in the stopped vehicle and to exercise his or her authority in a manner that does not expose such persons to an unreasonable risk of harm; thus, the summary judgment in favor of defendants cannot be upheld on the theory that the CHP officer owed no duty of care to plaintiffs. Furthermore, although a jury properly could find from the evidence presented by defendants in support of the summary judgment motion that the CHP officer was not negligent in directing the automobile in which plaintiffs were riding to stop in the center

median under the circumstances of this case, we agree with the Court of Appeal that, in view of the conflicting declarations and the provisions of the CHP Officer Safety Manual submitted by plaintiffs in opposition to the summary judgment motion, the issue whether the officer was or was not negligent cannot properly be resolved by a court as a matter of law and instead presents a triable issue of fact for the jury's determination. Accordingly, we conclude that the trial court erred in granting summary judgment in favor of defendants, and that the judgment of the Court of Appeal, reversing the trial court's ruling, should be affirmed.

## I

On August 15, 1996, Richard Hedgecock, a CHP motorcycle patrol officer, was on duty in San Diego County on Highway 78, a limited access highway with three eastbound and three westbound lanes. The weather was dry, visibility was good, and traffic was moderate to fairly heavy. Shortly before 5:00 p.m., Hedgecock observed a Toyota Camry traveling westbound at an estimated speed of 85 miles per hour in the fast, or number one, lane. Hedgecock pulled his motorcycle along the right side of the Camry, sounded his siren to attract the attention of its driver, and motioned to the driver to stop in the center median area of the highway. As directed, the driver pulled the car over to the left and stopped the Camry in the center median of the highway. Hedgecock stopped 10 to 15 feet behind the Camry, close to a two-foot-high concrete barrier separating the westbound median area from traffic traveling in the eastbound direction, and turned off the motorcycle's lights.

Hedgecock walked to the driver's side of the Camry, which was about two feet from the concrete median barrier. Hedgecock noticed that the three young girls in the backseat of the Camry (Zean Lugtu, Zeachelle Lugtu, and Leah Cabildo) were not restrained by seat belts. The driver of the Camry, Michael Lugtu, identified himself as the uncle of the three girls, and identified the other passenger in front, Cecelio Lugtu, as the father of two of the girls. Hedgecock issued a speeding citation to Michael Lugtu and a seat belt citation to Cecelio Lugtu.

After writing the citations, Hedgecock noticed that the girl in the middle rear seat still did not have her seat belt on, and he stated he would issue another citation if she were not restrained by a seat belt. Michael Lugtu got out of the Camry, apparently to try to help retrieve the middle rear seat belt, as Hedgecock began walking back to his motorcycle. The other four occupants remained within the vehicle. At that point, the Camry had been stopped in the median area for about six to eight minutes.

As Hedgecock returned to his motorcycle, he observed a pickup truck, traveling westbound in the fast lane, begin drifting further and further into the center median toward Hedgecock and the Camry. As the truck approached, Hedgecock waved and jumped up and down, trying to attract the attention of the truck's driver, James Neeb, who appeared to Hedgecock to be looking down inside the truck. Just as the truck was about to hit him, Hedgecock dove over the concrete median barrier and heard a very loud crash.

The truck did not hit Hedgecock or Michael Lugtu, but it struck the rear of the Camry while Cecelio Lugtu and the three young girls were inside. All four of the car's occupants were seriously injured in the accident.

In August 1997, Cecelio Lugtu and the three young girls (plaintiffs) filed the present action against Hedgecock and the CHP (defendants), Neeb (the driver of the pickup truck), and Michael Lugtu (the driver of the Camry), alleging that each was negligent and that the negligence of each was a substantial cause of plaintiffs' injuries.[1]

In September 1998, after several depositions had been taken, defendants filed a motion for summary judgment, asserting that (1) Hedgecock did not owe a duty of reasonable care to plaintiffs, (2) as a matter of law, the accident was not foreseeable and Hedgecock's conduct was not a legal cause of plaintiffs' injuries, and (3) defendants were statutorily immune from liability. Defendants maintained that Hedgecock owed no duty of reasonable care to plaintiffs, because Hedgecock's alleged responsibility for plaintiffs' injuries arose merely from a failure to protect plaintiffs from injury (which defendants characterized as a negligent omission or nonfeasance), and because Hedgecock assertedly did not have the requisite special relationship with plaintiffs on which negligence liability for failure to provide such protection could be based. Defendants also contended that the undisputed facts established as a matter of law that Hedgecock was not negligent and that, in any event, his conduct was not a legal cause of plaintiffs' injuries. Finally, defendants argued that they were immune from liability under a number of statutory immunity provisions. (See Gov. Code, §§ 820.2, 821.6, 845.)

In support of their summary judgment motion, defendants submitted declarations of Hedgecock and Arnold Sidney, another CHP officer. Hedgecock stated in his declaration that he decided to stop the Camry in the

---

[1]The California Department of Transportation also was named as a defendant in a cause of action alleging a dangerous condition of public property, but plaintiffs later voluntarily dismissed the department as a defendant.

10-foot-wide, asphalt-surfaced center median because the distance that the Camry had to travel to the center median was considerably less than the distance to the right shoulder, and because he believed that stopping the vehicle in the center median posed a lesser hazard to him and to the Camry's occupants than stopping the vehicle on the right shoulder, which at that location was only approximately eight feet wide.[2] Hedgecock indicated that at the time he directed the Camry's driver to pull into the center median, he was aware that there was traffic immediately behind him in the center lane and "quite a lot of traffic" in the right-hand lane. Hedgecock also declared that CHP procedures gave him discretion whether to stop a traffic violator in the median area or on the right shoulder (the declaration stated that "[i]t is basically up to the officer to select a safe place to make a traffic stop"), and that he previously had stopped vehicles in that vicinity in both the center median and on the right shoulder. Finally, Hedgecock indicated that at the time he directed the Camry to pull into the center median, he had no knowledge of prior accidents having occurred within the center median in that vicinity.

In his separate declaration, Sidney stated that he had been a CHP officer since 1969, had been trained in CHP motorcycle patrol procedures, and had been instructed that a motorcycle patrol officer has discretion to make a traffic enforcement stop in the median area, particularly if the violator's vehicle is traveling in the fast lane. Sidney further stated that he subsequently had received specialized training and had become a certified motorcycle training officer, and that in 1991 he had trained Hedgecock in CHP motorcycle patrol procedures and had instructed Hedgecock that a traffic stop in the median area is appropriate if the violator is in the fast lane and if the officer believes a stop in the median area is safer. Sidney's declaration also explains in some detail why, in his opinion, a stop in the median area may be particularly appropriate when the stop is made by a motorcycle officer rather than by an officer in a patrol car.[3] Finally, Sidney stated that based upon his review of Hedgecock's declaration, the accident report, photographs of the accident scene and involved vehicles, and the CHP Departmental Motorcycle Manual and CHP Officer Safety Manual, in his

---

[2]Hedgecock's declaration further disclosed that the right shoulder was asphalt surfaced and 7.8 feet wide and was adjacent to a concrete dike, which was next to a downhill slope.

[3]Sidney's declaration states in this regard: "[M]otor vehicle drivers may not key in to the presence of the patrol motorcycle as well as drivers do to the presence of a patrol car; the throttle controlling speed of a patrol motorcycle is on the right handlebar grip; if the officer takes his or her right hand off the throttle to signal traffic behind the motorcycle and violator that the enforcement stop will take place on the right shoulder, the motorcycle will slow down, exposing the violator and the motorcycle patrol officer to potential danger from traffic behind them; although the vehicle immediately behind the motorcycle may slow in response to the slowing of the motorcycle, traffic further back may not see the motorcycle slowing, causing an accordion effect."

opinion Hedgecock had acted reasonably and with a proper exercise of discretion in directing Michael Lugtu to stop within the center median area of Highway 78.

In response to defendants' motion for summary judgment, plaintiffs filed a lengthy opposition. Plaintiffs initially maintained that defendants' claim that Hedgecock owed no legal duty of care to plaintiffs rested on a mischaracterization of the basis of Hedgecock's alleged liability, and asserted that the alleged negligent conduct of Hedgecock at issue in this case involved an affirmative act of misfeasance—directing the driver of the vehicle in which they were passengers to stop the vehicle in an assertedly dangerous location—rather than an act of omission or nonfeasance as argued by defendants. Second, plaintiffs insisted that the question whether Hedgecock had been negligent or instead had exercised due care in directing the driver of the Camry to stop in the center median could not be decided as a matter of law, but instead clearly presented a triable question of fact for the jury's determination. In this regard, plaintiffs vigorously disputed the assertion in Hedgecock's and Sidney's declarations that the applicable CHP procedures gave CHP officers discretion to stop a vehicle either in the center median or on the right shoulder, maintaining that the applicable CHP Officer Safety Manual flatly contradicted that assertion by explicitly providing that "[a]fter determining that a driver is to be stopped, effective techniques should be used to ensure stopping on the right shoulder rather than in the median or in a traffic lane." Plaintiffs additionally asserted that the question whether Hedgecock's negligence was a legal cause of plaintiff's injuries presented a triable issue of fact for the jury and could not be determined as a matter of law. Finally, plaintiffs maintained that the governing precedents interpreting the statutory immunity provisions relied upon by defendants established that the immunity afforded by each of those statutes did not apply to the conduct of defendants at issue in this case.

In support of their opposition to the summary judgment motion, plaintiffs submitted a declaration of Joseph Thompson (a former CHP officer and CHP accident investigation supervisor), a copy of chapter 10 of the CHP Officer Safety Manual, a copy of the accident report, and brief excerpts from the depositions of Hedgecock and Sidney.

Thompson stated in his declaration that he had been employed by the CHP from 1959 through 1982 both as a motorcycle and patrol car officer and as an accident investigator and supervisor, and in the latter capacity had been responsible for conducting more than 2,000 accident investigations. Thompson stated he was "extremely familiar" with the CHP Officer Safety Manual in effect at the time of the accident, and that the manual, and all CHP

motorcycle and patrol car training, "mandate[s] that routine traffic enforcement stops on California freeways shall be made by directing all violators over to the right shoulder for purposes of violator and officer protection." Thompson further stated that "[s]topping a violator in the center median lane of a California freeway is not permitted by the [CHP] Officer Safety Manual as this creates a substantial risk of harm to the violator as well as the patrol officer due to the increased speed of vehicles in the inside/fast or number one lane of travel." Thompson's declaration further explained in this regard that "[t]he center median lane is for emergency vehicles only and users of the freeway do not expect to see a routine traffic stop being enforced in the center median lane. The sight of a traffic enforcement stop being conducted in the center median startles users of the freeway in the number one or fast lane of traffic causing them to lose control of their vehicles."

Moreover, in contrast to the views expressed by Sidney in his declaration, Thompson's declaration stated that the CHP manuals and training make "no distinction between motorcycle and patrol car officers in how to make a routine traffic stop from all lanes of the freeway" (original underlining), and that nothing in the applicable motorcycle manual allows for officer discretion in this regard. Finally, Thompson stated in his declaration that, based upon his review of the depositions of Hedgecock and Sidney, the accident report, the CHP Departmental Motorcycle Manual, and the CHP Officer Safety Manual (in particular, chapter 10, pertaining to patrol and enforcement on the freeway), in Thompson's opinion "Officer Hedgecock was negligent by violating the California Highway Patrol enforcement techniques in directing Michael Lugtu to the center median lane instead of over to the right shoulder," and that in doing so Hedgecock "substantially increased the risk of harm to the occupants in the Lugtu vehicle and to the officer."

In addition to Thompson's declaration, plaintiffs submitted a copy of chapter 10 of the CHP Officer Safety Manual, entitled Patrol and Enforcement on the Freeway, which states in relevant part:

"3. ENFORCEMENT TECHNIQUES.

"a. Stopping the Violator.

"(1) After determining that a driver is to be stopped, *effective techniques should be used to ensure stopping on the right shoulder rather than in the median or in a traffic lane.* Because of the hazards of high speed and traffic volume on modern freeways, the officer must be aware of his/her primary responsibility to control traffic approaching from the rear when attempting to stop a violator. Under these conditions, one error by a single driver can

cause multiple traffic collisions. Special and unique methods have been developed which materially reduce the hazards involved in directing the violator from a high-speed traffic lane to a position of safety. The following procedures should be used whenever possible. [¶] . . . [¶]

"(b) The patrol vehicle should normally be offset slightly to the right and to the rear of the violator's vehicle to permit evasive action if it becomes necessary and *also to provide a protected lane for the violator's safe movement to the right.* The rear amber warning light should be used at this time to warn following traffic of the impending stop. . . .

"(2) When difficulties arise in gaining [the] violator's attention, it may be necessary to pull abreast, preferably on the right side, in order to attract the driver's attention. . . .

"(a) The moment the violator looks and identifies the patrol unit, the officer should apply the brakes slightly. No matter how the fast the violator's reflexes are, the officer then has control of the situation and can slow down as necessary.

"(b) *The driver should be directed by the use of the hand gesture to the right lane.* During a violator's transition to the right, traffic should be held back in adjacent lanes by the use of the rear amber light, turn signals and hand gestures. . . .

"(c) If the driver's attention is not gained in time to stop at a desired stopping location, he/she should be permitted to proceed, if practicable, to the next safe stopping location. . . . [¶] . . . [¶]

"(3) *If possible, ensure a violator does not stop in the roadway or park in the median divider.* All stops on freeways should be made completely off the roadway and as inconspicuously as possible to minimize the possibility of a traffic slowdown. . . .

"(4) *When a violator stops in the center divider, the officer must make a decision whether to handle the transaction there or request a move to a safer location.* Factors to be considered are divider width, traffic speed, traffic density, and other surrounding circumstances. The ultimate question is 'Are the hazards of conducting the stop in the center divider more or less than moving the violator across multiple freeway lanes?'

"(5) Avoid stopping motorists where restricted shoulders or heavy congestion exists. The stop should be delayed until a safe location is

reached. . . ." (CHP, Officer Safety Manual (July 1991 rev.) pp. 10-3 to 10-6, italics added.)[4]

Defendants thereafter filed a reply to the opposition, attaching additional portions of the CHP Officer Safety Manual that defendants maintained (1) demonstrated that the manual should not be interpreted, as Thompson had suggested, as *mandating* that all traffic stops on a highway be made on the right shoulder rather than the center median, but rather should be interpreted to grant a CHP officer discretion in this matter, and (2) further supported their contention that Hedgecock's conduct was reasonable and not negligent.[5] Defendants also submitted additional excerpts from Sidney's deposition, in which Sidney stated that when the CHP Officer Safety Manual uses the word "should" rather than "shall," the manual "is leaving the officer with an option and his best judgment to do what the situation may call [for]."

---

[4]As noted above, in addition to the declaration of Thompson and the passage from the CHP Officer Safety Manual, plaintiffs submitted a copy of the accident report and very brief excerpts of the depositions of Hedgecock and Sidney. In the excerpt from the Hedgecock deposition, Hedgecock acknowledged that after the incident there were discussions in his CHP office "concerning whether it was prudent to pull traffic over to the right versus left" and that someone in the discussion had indicated "something to the effect, 'Oh man, you always have to go to the right, never to the left.'" In the excerpt from the Sidney deposition, Sidney agreed that the traffic enforcement technique provisions of chapter 10 of the CHP Officer Safety Manual are applicable both to patrol cars and motorcycles.

[5]The additional excerpts of the CHP Officer Safety Manual submitted with defendants' reply included the following passage:

"FOREWORD

"This manual was developed in the interest of officer safety to assist members in performing their duties in a safe and professional manner. [¶] The policies and procedures set forth have been established for the purpose of promoting the safety of the enforcement officer through the proper use of safety equipment and enforcement procedures. [¶] The officer's safety is of the utmost concern and proper use of the techniques depicted in this manual should prove a valuable aid in minimizing injuries. [¶] . . . [¶]

"APPREHENSION OF THE MISDEMEANOR VIOLATOR

"1. MAKING THE STOP.

"a. Quick Apprehension. Upon observing a violation, the officer should stop the violator's vehicle as soon as possible. Many problems may be generated when the officer waits too long before stopping the violator.

"(1) The farther the violator is pursued, the longer the officer is exposed to the hazard of high speed and his/her safety is greatly affected. [¶] . . . [¶]

"(4) In the case of speed violations, among others, the defense can raise the point that if the speed was so dangerous, why did the officer permit the violator to continue for some distance rather than stop him/her promptly.

"(b) Choosing a Safe Location. . . .

"(1) The officer should pre-select a safe location to stop the violator, keeping in mind his/her own safety as well as that of the violator and the general public. [¶] . . . [¶]

"4. SUMMARY. Each traffic stop presents a slightly different set of circumstances to the officer. For overall officer safety, it is best to remember the basic concepts presented above rather than memorizing one method and performing each stop exactly alike. The officer who has a plan and is flexible to meet each situation is the officer who survives." (Original underlining.)

After considering defendants' motion, plaintiffs' opposition, defendants' reply, and the supporting declarations and other submitted material, the trial court granted summary judgment in favor of defendants, concluding that "Hedgecock had no duty to stop plaintiffs on the right shoulder as a matter of law and there is no triable issue of fact as to whether Hedgecock acted with due care or whether his conduct was a legal cause of plaintiffs' injuries. In addition, even assuming a duty, lack of due care, and causation, defendants are immune from liability."

On appeal, the Court of Appeal reversed, concluding that Hedgecock owed plaintiffs a legal duty of reasonable care when he directed the driver of the Camry to stop the vehicle in a particular location, and that, in view of the provisions of the CHP Officer Safety Manual and the conflicting declarations that were before the trial court, there was a triable issue of fact whether Hedgecock was negligent and, if so, whether that negligence was a legal cause of plaintiffs' injuries. Finally, the Court of Appeal concluded that defendants' claims of statutory immunity lacked merit.

Defendants sought review in this court, limiting their challenge to the negligence issue, with particular attention to the Court of Appeal's conclusion on the question of duty.[6] We granted review to address these points.

II

We begin with the issue of duty. (See generally *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 202-203 [185 Cal.Rptr. 252, 649 P.2d 894].)

██ Under the provisions of the California Tort Claims Act, "*a public employee* is liable for injury caused by his act or omission *to the same extent as a private person*," except as otherwise specifically provided by statute. (Gov. Code, § 820, subd. (a), italics added.) In addition, the Tort Claims Act further provides that "[*a*] *public entity* is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment *if the act or omission would . . . have given rise to a cause of action against that employee*," unless "the employee is immune from liability." (Gov. Code, § 815.2, subds. (a), (b), italics added.) Because it is undisputed that Hedgecock was acting within the scope of his employment when he engaged in the conduct at issue in this case, the initial question of

---

[6]Defendants' petition for review did not challenge the Court of Appeal's determination that the statutory immunity provisions relied upon by defendants in their summary judgment motion do not apply to the conduct of Hedgecock at issue in this case, and we thus do not address the issue of immunity.

duty, and defendants' potential liability for Hedgecock's conduct, turns on ordinary and general principles of tort law.

Under general negligence principles, of course, a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct. (Civ. Code, § 1714; see generally Rest.2d Torts, § 281; Prosser & Keeton on Torts (5th ed. 1984) § 31, p. 169; 3 Harper et al., The Law of Torts (2d ed. 1986) § 18.2, pp. 654-655.) It is well established, moreover, that one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person. (See, e.g., *Schwartz v. Helms Bakery Limited* (1967) 67 Cal.2d 232, 240-244 [60 Cal.Rptr. 510, 430 P.2d 68]; *Richardson v. Ham* (1955) 44 Cal.2d 772, 777 [285 P.2d 269]; see generally Rest.2d Torts, §§ 302, 302A.[7]) It is this duty that plaintiffs alleged was breached by Hedgecock.

 In their summary judgment motion, however, defendants asserted that Hedgecock owed no duty of care to plaintiffs because "[t]he alleged failure of defendant Hedgecock to protect plaintiffs from injury by defendant Neeb is, at most, a negligent omission, or nonfeasance," and because there assertedly was no "special relationship" between Hedgecock and plaintiffs that would support the imposition of liability on the basis of such an omission. We agree with plaintiffs that this argument rests upon a fundamental mischaracterization of the basis of Hedgecock's alleged responsibility for plaintiffs' injuries.

It is true that the duty plaintiffs rely upon is said to be restricted to instances of misfeasance, not nonfeasance. As this court explained in *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36], however, "[m]isfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention." In this case, unlike the cases relied upon by defendants, plaintiffs' cause of action does not rest

---

[7]Section 302 of the Restatement Second of Torts provides: "A negligent act or omission may be one which involves an unreasonable risk of harm to another through either [¶] (a) the continuous operation of a force started or continued by the act or omission, or [¶] (b) the foreseeable action of the other, a third person, an animal, or a force of nature."

Section 302A provides: "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person."

upon an assertion that defendants should be held liable for failing to come to plaintiffs' aid, but rather is based upon the claim that Hedgecock's affirmative conduct itself, in directing Michael Lugtu to stop the Camry in the center median of the freeway, placed plaintiffs in a dangerous position and created a serious risk of harm to which they otherwise would not have been exposed. Thus, plaintiffs' action against Hedgecock is based upon a claim of misfeasance, not nonfeasance.

Consistent with the basic tort principle recognizing that the general duty of due care includes a duty not to expose others to an unreasonable risk of injury at the hands of third parties, past California cases uniformly hold that a police officer who exercises his or her authority to direct another person to proceed to—or to stop at—a particular location, owes such a person a duty to use reasonable care in giving that direction, so as not to place the person in danger or to expose the person to an unreasonable risk of harm. Thus, for example, in *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], this court recognized that although law enforcement officers, like other members of the public, generally do not have a legal duty to come to the aid of a person, in carrying out routine traffic enforcement duties or investigations, a duty of care does arise when an officer engages in *"an affirmative act which places the person in peril or increases the risk of harm* as in *McCorkle* v. *Los Angeles* (1969) 70 Cal.2d 252 [74 Cal.Rptr. 389, 449 P.2d 453], where an officer investigating an accident directed the plaintiff to follow him into the middle of the intersection where the plaintiff was hit by another car." (34 Cal.3d at p. 24, italics added.)

The Court of Appeal recognized this same principle in *Whitton v. State of California* (1979) 98 Cal.App.3d 235 [159 Cal.Rptr. 405, 17 A.L.R.4th 886]. In that case, CHP officers had made a traffic stop of the plaintiff's automobile on the right shoulder of a highway, parking their patrol car 10 to 15 feet behind the plaintiff's vehicle, and a drunk driver subsequently struck the patrol car, propelling it into the plaintiff while she was standing between the patrol car and her own vehicle. Although the Court of Appeal in *Whitton* found that sufficient evidence supported the jury's determination that, under the circumstances of the case, the officers had acted with reasonable care and thus should not be held liable, that court explicitly recognized that the CHP officers, in making the traffic stop, had a duty "to perform their official duties in a reasonable manner." (*Id.* at p. 241; see also *Reed v. City of San Diego* (1947) 77 Cal.App.2d 860, 866-867 [177 P.2d 21] [upholding jury verdict imposing liability upon police department where officers' negligence in positioning their patrol car during a traffic stop resulted in an injury to the stopped motorist when a third car collided with the police vehicle].) Other

states also have recognized that law enforcement officers, in making a traffic stop, have a legal duty to exercise due care for the safety of those whom they stop and may incur liability when their failure to exercise such care exposes a person to injury at the hands of another motorist. (See, e.g., *Kaisner v. Kolb* (Fla. 1989) 543 So.2d 732, 734-736; *Kinsey v. Town of Kenly* (1965) 263 N.C. 376 [139 S.E.2d 686, 688-690].)

Accordingly, we conclude that, under California law, a law enforcement officer has a duty to exercise reasonable care for the safety of those persons whom the officer stops, and that this duty includes the obligation not to expose such persons to an unreasonable risk of injury by third parties. The summary judgment in favor of defendants cannot be sustained on the ground that Hedgecock owed no legal duty of care to plaintiffs.

### III

Although defendants argued in their summary judgment motion that a law enforcement officer in making a traffic stop on a highway owes no duty of care to the persons he or she stops, in their briefs before this court defendants have modified their position and now ask this court to adopt a rule that "the duty of a law enforcement officer who has made a traffic enforcement stop entirely off of the travel lanes of a freeway [does] not extend to liability for a traffic collision in which a third party's vehicle subsequently strikes the car stopped by the officer."

As this court explained in *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167, 27 A.L.R.5th 899], it is more accurate to view defendants' present argument not as relating to the threshold question of the existence of a duty itself—defendants no longer claim that an officer owes *no* duty of care to passengers in a vehicle stopped by the officer—but rather as relating to the appropriate "standard of care."[8] Defendants argue in essence that we should declare, as part of the governing standard of care, that a law enforcement officer, in making a traffic stop on a highway, *always* satisfies the duty of reasonable care so long as the officer stops a vehicle at any location off of the travel lanes of a highway—without regard to whether the stop is made in the center median of a freeway or on the right shoulder, and apparently also without regard to the width of the median or shoulder on which the stop is made, how far off the roadway the stopped car is located, the visibility of the stopped vehicle to oncoming

---

[8]As the court in *Ramirez* explained: "Issues such as this, which concern the scope of an established duty, are resolved by reference to the governing standard of care: 'Once the existence of a legal duty is found, it is the further function of the court to determine and formulate the standard of conduct to which the duty requires the defendant to conform.' (Rest.2d Torts, § 328B, com. f, p. 153.)" (*Ramirez v. Plough, Inc., supra,* 6 Cal.4th at p. 546.)

traffic at the location of the stop, or any other potentially relevant circumstance.

From a commonsense perspective, defendants' proposal has little to recommend it. It is counterintuitive to suggest that an officer's conduct should be considered prudent whenever the officer stops a vehicle in the center median of a highway so long as the vehicle that the officer has stopped is not actually in the travel lane of the highway, no matter how narrow the center median strip and how little room there is between the stopped vehicle and the approaching traffic. Indeed, under the defendants' formulation, a law enforcement officer's conduct would be deemed to satisfy the duty of reasonable care even if the center median of a highway is very narrow and the right shoulder generously wide, and even if there is no barrier to traffic traveling in the other direction, and the officer chooses the sole location that is not readily visible to oncoming traffic. Defendants fail to cite any decision in California or in any other jurisdiction—and our research has disclosed none—that defines in such a manner the standard of care applicable to a traffic stop on a highway.

Moreover, defendants are unable to point to any legislative or administrative pronouncement accepting their claim that considerations of "public policy" support the rule they propose. Defendants' reliance upon this court's decision in *Ramirez v. Plough, Inc., supra,* 6 Cal.4th 539, is misplaced. In that case, we relied upon "the dense layer of state and federal statutes and regulations that control virtually all aspects of the marketing of [the defendant drug manufacturer's] products" (*id.* at p. 548), as well as our assessment that "[d]efining the circumstances under which warnings or other information should be provided in a language other than English is a task for which legislative and administrative bodies are particularly well-suited" (*id.* at p. 550), in concluding that a drug manufacturer satisfies its duty to warn of adverse side effects by providing such warnings in English, as required by the applicable federal and state regulations. ██ ██ ██ In the present case, by contrast, no legislative, administrative, or other official pronouncement indicates that an officer fully satisfies his or her duty of due care in making a traffic stop so long as the officer stops the vehicle off the travel lane of a freeway, regardless of the configuration of the area in which the stop is made or the ready availability of alternative, safer sites in which the stop could have been made.[9]

Indeed, not only is there no statute or regulation that supports defendants' contention, but the provisions of the CHP Officer Safety Manual submitted

---

[9]Indeed, as the court explained in *Ramirez v. Plough, Inc., supra,* 6 Cal.4th 539, 547-548, even when a defendant has complied with an applicable statute or regulation, "[c]ourts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability. The Restatement Second of Torts summarizes the prevailing view in these terms:

by plaintiffs appear fundamentally inconsistent with defendants' position. As indicated by the lengthy quotation set forth above, the CHP Officer Safety Manual clearly establishes at the very least a general preference for directing a cited vehicle to the right shoulder of a highway, rather than to the center median. All of the manual's references to stops in the median appear to refer only to instances in which a motorist stops in the center median *on his or her own volition, presumably without the officer's direction to do so*. And even in such instances, the officer is advised to consider directing the driver to move to a safer location. No provision in the manual establishes that the officer acts properly or with due care so long as he or she stops a vehicle entirely within a center median strip.

In considering the effect that the provisions of the CHP Officer Safety Manual should have in the present case, it is important to keep in mind the appropriate role that the provisions of such a safety manual may play in a negligence action under California law. ■ Under Evidence Code section 669.1,[10] the provisions of the CHP Officer Safety Manual may not properly be viewed as *establishing* the applicable standard of care, but they may be *considered* by the trier of fact in determining whether or not an officer was negligent in a particular case. The manual cannot be read to *establish* the standard of care, because there is no indication that the manual was adopted pursuant to the state (or federal) Administrative Procedure Act. Absent such adoption, Evidence Code section 669.1 forbids the use of the manual to establish the presumption of negligence that otherwise would arise under Evidence Code section 669. At the same time, Evidence Code section 669.1 specifies that this statute is not intended to affect the admissibility of such a manual into evidence, and thus it is clear that the manual may be considered

---

'Where a statute, ordinance or regulation is found to define a standard of conduct for purposes of negligence actions, . . . the standard defined is normally a minimum standard, applicable to the ordinary situations contemplated by the legislation. This legislative or administrative minimum does not prevent a finding that a reasonable [person] would have taken additional precautions where the situation is such as to call for them.' [Citations.]" (See also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 756, p. 96, and cases cited.)

[10]Evidence Code section 669.1 provides in full: "A rule, policy, manual, or guideline of state or local government setting forth standards of conduct or guidelines for its employees in the conduct of their public employment shall not be considered a statute, ordinance, or regulation of that public entity within the meaning of Section 669, unless the rule, manual, policy, or guideline has been formally adopted as a statute, as an ordinance of a local governmental entity in this state empowered to adopt ordinances, or as a regulation by an agency of the state pursuant to the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Division 3 of Title 2 of the Government Code), or by an agency of the United States government pursuant to the federal Administrative Procedure Act (Chapter 5 (commencing with Section 5001) of Title 5 of the United States Code). This section affects only the presumption set forth in Section 669, and is not otherwise intended to affect the admissibility or inadmissibility of the rule, policy, manual, or guideline under other provisions of law."

as evidence on the question of negligence. (See, e.g., *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 809 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642].)[11]

 Because the relevant provisions of the CHP Officer Safety Manual submitted by plaintiffs indicate, at the least, a strong preference for stopping a vehicle on the right shoulder rather than in the center median, and advise officers to consider carefully whether to require a motorist to move the vehicle from the center median even when the driver stops on the center median on his or her own volition, we cannot accept defendants' assertion that considerations of public policy support the adoption of a standard of care under which a CHP officer *never* could be found to have violated the duty of care so long as he or she stops a vehicle off the travel lanes of a freeway, without regard to any other relevant factor that may affect the reasonableness of the officer's action. Instead, as in negligence cases generally, we believe that the applicable standard of care by which the officer's conduct must be measured in this context is simply that "of a reasonably prudent person under like circumstances." (*Ramirez v. Plough, Inc., supra,* 6 Cal.4th 539, 546-547, and cases cited.)

In arguing that considerations of public policy justify the adoption of the narrow standard of care that they propose, defendants apparently fear that the application of ordinary negligence principles in the present context will impair the ability of CHP officers to carry out their responsibilities and will result in an inordinate financial liability to the state, because juries will be too ready to second-guess police officers in the exercise of their discretion in making traffic stops. To the extent that past cases provide any guidance, this limited precedent does not support defendants' prediction. As noted above, in *Whitton v. State of California, supra,* 98 Cal.App.3d 235—probably the closest California case on point—the jury returned a verdict against a plaintiff who had been injured by a drunk driver as she was stopped for a traffic violation. The jury found that the CHP officers who had stopped the plaintiff's car (on the right shoulder of the highway) and, after detecting

---

[11]The legislative history of Evidence Code section 669.1 confirms that the Legislature contemplated that the statute would permit a jury or other trier of fact to take the provisions of such a safety manual into account in determining in a particular case whether a public employee was negligent or not. (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1598 (1985-1986 Reg. Sess.) as amended Aug. 20, 1987, p. 4 ["Under the bill, a violation of a rule or manual regarding a public employee's conduct would remain admissible as evidence of the employee's negligence. However, it would no longer give rise to a presumption of negligence."]; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1598 (1985-1986 Reg. Sess.) as amended Aug. 20, 1987, p. 3 ["Under this bill a violation of any state or local rule, policy, manual, or guideline not 'formally adopted' may continue to be admissible as evidence of an employee's negligence. However, the violation will not give rise to a presumption of negligence."].)

alcohol on the plaintiff's breath, conducted a sobriety test on the plaintiff as she stood between her vehicle and the patrol car, were not negligent. As *Whitton* demonstrates, the various considerations that an officer is required to take into account in deciding when and where to make a traffic stop, and how to conduct an investigation after the stop, are not beyond the understanding or experience of most jurors, and there is little reason to suspect that juries in general will not grant an officer engaged in law enforcement duties appropriate leeway in assessing the reasonableness of the officer's conduct.

In sum, we find no justification for the limitation on the ordinary standard of care that defendants propose. Of course, if the Legislature determines that the application of general common law negligence principles in this setting is undesirable or detrimental, it remains free to fashion an appropriate response, either through the creation of a statutory immunity or the promulgation of a legislatively prescribed standard of care. In the absence of such legislative action, we conclude that the ordinary negligence standard of care should apply in this context.

## IV

Defendants further contend that even if, as we have concluded above, Hedgecock's conduct must be evaluated under the ordinary standard of reasonable care, the summary judgment in their favor should be upheld on the theory that the trial court correctly found that the undisputed facts establish, as a matter of law, that Hedgecock was not negligent under that standard. ■ As this court recently explained in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], "the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if . . . the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."

■ In support of their claim that no triable issue of fact existed on the question whether Hedgecock was negligent, defendants stress that it is undisputed that (1) the center median was wider than the right shoulder at the location where the stop in this case was made, (2) the Camry was traveling in the fast lane and thus a stop in the center median did not require the Camry to cross other lanes of traffic, whereas a stop on the right shoulder would have required the Camry to cross two lanes of traffic, and (3) the weather and visibility were good, reducing the risk that oncoming traffic might not see a stopped vehicle in the median strip.

All of the circumstances upon which defendants rely clearly are relevant to the determination whether defendants were negligent and properly could persuade a jury that Hedgecock was not negligent in stopping the Camry as he did. Nonetheless, the declarations and other evidence presented by plaintiffs in opposition to the summary judgment motion constitute evidence from which a jury could come to a contrary conclusion, thus raising a triable issue of fact on the question of negligence.

First, the provisions of the CHP Officer Safety Manual constituted evidence from which a jury could find that stops in the center median, as a general matter, create a greater risk of injury than stops on the right shoulder, and that, absent unusual circumstances, an officer in the exercise of reasonable care ordinarily should stop a vehicle on the right shoulder. As discussed above, although under Evidence Code section 669.1 a jury determination that Hedgecock had violated the provisions of the CHP Officer Safety Manual would not raise a presumption of negligence, that statute does not preclude a jury from taking into account the provisions of the manual in determining whether Hedgecock was or was not negligent under the circumstances of this case.

Second, the declaration of Thompson, a former CHP officer and former accident investigator and investigation supervisor, also constitutes evidence that would support a jury finding that Hedgecock was negligent. As noted above, Thompson stated in his declaration that stops in the center median of a highway pose a greater danger than stops on the right shoulder, because oncoming vehicles are less likely to expect to see cars or motorcycles stopped in the center median and thus are more likely to be distracted by such an event. He further stated that because vehicles traveling in the left lane of a freeway generally are traveling faster than those in the right lane, a driver in the left lane is more likely to lose control of his or her vehicle (and less likely to be able to avoid a collision) in the event the distraction leads the driver to swerve away from the stopped vehicle.

Third, a jury might find that although the existence of circumstances such as bad weather or an emergency could have made it reasonable for Hedgecock to direct the Camry to the center median, there was insufficient justification under the present circumstances for Hedgecock to subject plaintiffs to the risks inherent in such a stop—especially in view of the good weather and clear visibility prevailing at the time and location of the stop. Finally, particularly in light of the provisions of the CHP manual indicating that if a location is too dangerous the officer should delay the stop and wait for a safer location, a jury might conclude that if the width of the right

shoulder at the particular area of the highway was not sufficient to permit the stop to be made safely on the right shoulder, the officer, in the exercise of reasonable care, should have permitted the Camry to proceed further and have stopped the vehicle at a location where the right shoulder was wider.[12]

In sum, in light of the conflicting evidence relating to the requirements of CHP procedure in the situation presented, and the circumstance that the evidence disclosed by the declarations and counterdeclarations could support a jury's finding either that Hedgecock was not negligent or that he was negligent, the evidence before the trial court on the summary judgment motion clearly raised a triable issue for the jury's determination on the question of negligence. Indeed, as we have seen, the declarations of CHP Officer Sidney and former CHP Officer Thompson—both of whom had many years of experience in traffic enforcement—were in direct conflict on the ultimate question of whether Hedgecock was or was not negligent under the circumstances of this case. On this record, we conclude that the trial court erred in finding that the undisputed evidence established, as a matter of law, that Hedgecock was not negligent.[13]

---

[12]In response to the latter argument, defendants could counter that Hedgecock's actions were reasonable in light of the CHP Officer Safety Manual's direction, in a separate provision, that "[u]pon observing a violation, the officer should stop the violator's vehicle as soon as possible." (See, *ante*, p. 714, fn. 5.)

[13]The dissenting opinion misapplies the standard of care concept in maintaining that a court, in determining the applicable standard of care, properly looks to such case-specific facts as whether "the weather was dry and visibility was good," whether the traffic was light or heavy in the various lanes of the highway at the time of the incident, or whether the particular officer had or had not made similar traffic stops in the past. (See dis. opn. of Brown, J., *post*, at pp. 731-732.) That approach to the standard of care issue effectively would eliminate the role of the jury in negligence cases, transforming the question of whether a defendant breached the duty of care under the facts of a particular case into a legal issue to be decided by the court under the standard of care rubric. The dissent's conclusion is more accurately characterized as a determination that the present record establishes, as a matter of law, that Officer Hedgecock was not negligent. As explained above, however, we believe that in light of the conflicting evidence and declarations, the record before the trial court on the summary judgment motion clearly raised a triable issue for the jury's determination on the question of whether Officer Hedgecock was or was not negligent under the circumstances of this case.

The dissent also criticizes the opinion's treatment of the CHP Officer Safety Manual. (See dis. opn. of Brown, J., *post*, at pp. 732-734.) As explained above, however, the proper role that such a safety manual plays in a negligence case is governed by the provisions of Evidence Code section 669.1, and our consideration of the appropriate use of the manual follows the language and legislative history of that statute. (See, *ante*, pp. 720-721 & fns. 10, 11.) The dissent's position is inconsistent with the use that the Legislature contemplated for such a manual.

## V

 Finally, defendants argue that even if a triable issue of fact exists as to whether or not Hedgecock was negligent, the grant of summary judgment in their favor was nonetheless proper because even if the jury were to find that Hedgecock was negligent, the undisputed evidence established, as a matter of law, that Hedgecock's negligence was not a legal cause of plaintiffs' injuries. Defendants maintain in this regard that even if the jury were to find that Hedgecock breached his duty of due care and carelessly exposed plaintiffs to an unreasonable risk of harm, the conduct of the driver of the pickup truck—in diverting his eyes from the highway, drifting into the center median of the freeway, and ultimately colliding with the Camry—constitutes, as a matter of law, a superseding cause that relieves Hedgecock of responsibility for plaintiffs' injuries.

Defendants' contention lacks merit. It is well established that when a defendant's negligence is based upon his or her having exposed the plaintiff to an unreasonable risk of harm from the actions of others, the occurrence of the type of conduct against which the defendant had a duty to protect the plaintiff cannot properly constitute a superseding cause that completely relieves the defendant of any responsibility for the plaintiff's injuries. As the commentary to the Restatement Second of Torts explains: "The problem which is involved in determining whether a particular intervening force is or is not a superseding cause of the harm is in reality a problem of determining whether the intervention of the force was within the scope of the reasons imposing the duty upon the actor to refrain from negligent conduct. If the duty is designed, in part at least, to protect the other from the hazard of being harmed by the intervening force, or by the effect of the intervening force operating on the condition created by the negligent conduct, then that hazard is within the duty, and the intervening force is not a superseding cause." (Rest.2d Torts, § 281, com. h, p. 8; see, e.g., *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 769-770 [91 Cal.Rptr. 745, 478 P.2d 465]; *McEvoy v. American Pool Corp.* (1948) 32 Cal.2d 295, 298-299 [195 P.2d 783].) As further explained in *Soule v. General Motors* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298], for an intervening act properly to be considered a superseding cause, the act must have produced "harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule*, at p. 573, fn. 9.)

Under these principles, it is clear that the trial court could not properly find, as a matter of law, that the conduct of the driver of the pickup truck constituted a superseding cause that relieves Hedgecock of any legal responsibility for plaintiffs' injuries. The risk of harm posed by the negligence of

an oncoming driver is one of the foremost risks against which Hedgecock's duty of care was intended to protect. Accordingly, even if a jury were to determine that the driver of the pickup truck was negligent and that his negligence was a substantial and even predominant cause of plaintiffs' injuries, such a finding would not render the pickup driver's conduct a superseding cause that totally eliminates Hedgecock's responsibility for plaintiffs' injuries—although such a finding certainly would provide ample justification for the jury, in applying comparative fault principles, to apportion the bulk of responsibility for the accident to the pickup driver, rather than to the CHP officer. Indeed, the latter consideration provides a further reason to discount defendants' claim that a decision in plaintiffs' favor is likely to subject the state to substantial liability, because in most cases of this nature the great majority of fault is likely to be attributed to the third party, and not to the officer. (See Civ. Code, § 1431.2, subd. (a) ["In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ."].)

Thus, for the reasons discussed above, we cannot sustain the summary judgment that was rendered in favor of defendants on the theory that Hedgecock's conduct, as a matter of law, was not the legal cause of plaintiffs' injuries.

## VI

The judgment of the Court of Appeal, reversing the trial court's grant of summary judgment in favor of defendants, is affirmed.

Kennard, J., Werdegar, J., and Chin, J., concurred.

**BROWN, J.**—I respectfully dissent.

Like the majority, I agree that a police officer owes a general duty of care to the passengers in a vehicle stopped by that officer. I, however, believe the majority errs in formulating the appropriate standard of care. Under the undisputed facts, Officer Hedgecock's legal duty to plaintiffs did not include a duty to stop plaintiffs somewhere other than the center median of the freeway. Thus, Officer Hedgecock did not breach his legal duty to plaintiffs as a matter of law. Accordingly, I would reverse the judgment of the Court of Appeal and affirm the trial court's grant of summary judgment for defendants.

Like the existence of a legal duty, the *scope* of that duty is a question of law for the court. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 477 (*Merrill*).) In discussing the scope of Officer Hedgecock's duty, the majority characterizes the issue as whether an officer "*always* satisfies" the duty of care by stopping a traffic violator "at any location off of the travel lanes of a highway." (Maj. opn., *ante*, at p. 718.) Relying exclusively on *Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539 [25 Cal.Rptr.2d 97, 863 P.2d 167, 27 A.L.R.5th 899] (*Ramirez*), the majority answers "no" because no legislative or administrative pronouncements support such a rule (maj. opn., *ante*, at pp. 718-721), and because the California Highway Patrol Officer Safety Manual (Safety Manual) indicates "a strong preference for stopping a vehicle on the right shoulder rather than in the center median" (maj. opn., *ante*, at p. 721). The majority, however, engages in faulty analysis, and, in doing so, misstates the issue before the court. The issue is not whether an officer satisfies his duty of care *in every case* by stopping a traffic violator off the lanes of a highway. Rather, the issue is whether an officer satisfies his duty of care to the passengers of a car under the uncontested circumstances of this case when he stops their car in the median area. The answer should be "yes."

As an initial matter, the majority mistakenly assumes that the scope of a defendant's duty cannot depend on the particular facts of a case. "In most cases, courts have fixed no standard of care for tort liability more precise than that of a reasonably prudent person under like circumstances." (*Ramirez, supra*, 6 Cal.4th at p. 546.) "[H]owever . . . in particular situations a more specific standard may be established by judicial decision, statute or ordinance." (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 824 [59 Cal.Rptr.2d 756, 927 P.2d 1260].) Thus, " 'each case must be considered *on its own facts* to determine' " the scope of the legal duty owed by a defendant to a class of plaintiffs " 'to refrain from subjecting them to' " a given risk. (*Dillon v. Legg* (1968) 68 Cal.2d 728, 742 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] (*Dillon*), italics added, quoting *Hergenrether v. East* (1964) 61 Cal.2d 440, 445 [39 Cal.Rptr. 4, 393 P.2d 164].) Indeed, where the facts are undisputed, we have regularly affirmed summary judgment for a defendant even though the defendant owed a general duty of care to the plaintiff, because that general duty did not require the defendant to act any differently under the facts of the case. (See, e.g., *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1189-1199 [91 Cal.Rptr.2d 35, 989 P.2d 121] (*Sharon P.*); *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 477-483 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*); *Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 753-758 [167 Cal.Rptr. 70, 614 P.2d 728, 12 A.L.R.4th 701] (*Thompson*); cf. *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 616 [76 Cal.Rptr.2d 479, 957 P.2d 1313] [affirming summary judgment because there was "no triable issue of

fact concerning the scope of" defendant's duty under Rest.2d Torts, § 324A].)

The majority's second mistake lies in its exclusive focus on legislative or administrative pronouncements in formulating the standard of care. When determining the scope of a defendant's legal duty under the particular facts of a case, courts do not always rely on legislative or administrative pronouncements, but weigh *all* relevant public policy considerations. (See *Merrill, supra,* 26 Cal.4th at p. 477.) As part of the weighing process, " 'foreseeability of risk [is] of . . . *primary* importance. . . .' " (*Dillon, supra,* 68 Cal.2d at p. 739, italics added, quoting *Grafton v. Mollica* (1965) 231 Cal.App.2d 860, 865 [42 Cal.Rptr. 306].) Foreseeability for purposes of the duty analysis, however, is different from foreseeability "in the fact-specific sense in which we allow juries to consider [the] question." (*Parsons, supra,* 15 Cal.4th at p. 476.) "[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

After determining the foreseeability of harm, courts typically balance foreseeability against other relevant policy considerations to determine the scope of a defendant's duty "within the factual context of a specific case." (*Lopez v. McDonald's Corp.* (1987) 193 Cal.App.3d 495, 506 [238 Cal.Rptr. 436] (*Lopez*); see also *Parsons, supra,* 15 Cal.4th at p. 476.) Relevant policy considerations include "the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) "When public agencies are involved," courts may also consider " 'the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget.' " (*Thompson, supra,* 27 Cal.3d at p. 750, quoting *Raymond v. Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847].) This lengthy list of policy considerations, however, is neither exhaustive (*Lopez,* at p. 506), nor mandatory (see, e.g., *Sharon P., supra,* 21 Cal.4th at pp. 1191-1199 [analyzing legal duty without considering all the *Rowland* factors]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 678-680 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*) [same]).

Thus, where the relevant facts are undisputed, a court may define a more specific standard of care than the reasonably prudent person standard *if the public policy considerations warrant it*. In such cases, the court may be able to decide the case on summary judgment because the definition of a more specific standard of care often resolves an interrelated issue: whether a defendant breached his legal duty of care. " '[T]he question whether an act or omission will be considered a breach of duty . . . necessarily depends upon the scope of the duty imposed. . . .' " (*Federico v. Superior Court* (1997) 59 Cal.App.4th 1207, 1211 [69 Cal.Rptr.2d 370], quoting *Wattenberger v. Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732].) If a defendant's conduct satisfies the standard of care defined by the court as a matter of law under the undisputed facts of the case, then the defendant, by definition, has not breached any legal duty. Indeed, some of our early decisions rely on foreseeability of harm and other policy considerations to find no breach of a legal duty as a matter of law. (See, e.g., *La Manna v. Stewart* (1975) 13 Cal.3d 413, 428-429 [118 Cal.Rptr. 761, 530 P.2d 1073] [a pedestrian had no duty to continuously look "in the direction of potential oncoming traffic" under the facts and could not breach her legal duty because the imposition of such a duty would have placed her in even greater danger]; *Schmitt v. Henderson* (1969) 1 Cal.3d 460, 465-466 [82 Cal.Rptr. 502, 462 P.2d 30] [a pedestrian had no duty "to be alert to danger approaching him from behind" under the facts and could not breach his legal duty because there was no foreseeability of harm]; see also *Putensen v. Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1077-1078 [91 Cal.Rptr. 319] [balancing "the likelihood of harm, and the gravity of the harm if it happens . . . against the burden of precaution which would be effective to avoid the harm" under the facts of the case may lead to a finding that the defendant did not breach his duty of care as a matter of law (italics omitted)].)

A survey of our more recent negligence cases further illustrates these principles at work. In *Thompson*, the County of Alameda released a juvenile offender into a neighborhood without warning police, other parents in the neighborhood or the juvenile's mother. The released offender later murdered the plaintiffs' son. (*Thompson, supra*, 27 Cal.3d at p. 746.) Although we recognized that the county had a duty "to exercise reasonable care to protect *all* of its citizens" (*id.* at p. 753), we concluded that this duty did not include a duty to warn under the *particular* facts of the case (*id.* at pp. 756-758). We reached this conclusion "based in part on policy considerations and in part upon an analysis of 'foreseeability' *within the context of this case*." (*Id.* at p. 753, italics added.) We further acknowledged that the county may have had a duty to warn under different facts, i.e., if there had been "a prior threat to a specific identifiable victim." (*Id.* at p. 758.) Because the county lacked

such a duty under the facts of this case and therefore could not, as a matter of law, breach its general duty of care, we dismissed the plaintiffs' negligence claim. (See *ibid.*)

More recently, we affirmed summary judgment for a defendant after defining a more specific standard of care under the particular facts of that case based on public policy considerations. In *Parsons*, the plaintiff claimed that the defendant's negligent operation of a garbage truck caused her to fall off her horse. (*Parsons, supra*, 15 Cal.4th at p. 463.) Although we held that the defendant owed certain common law duties to the plaintiff, we concluded that these duties did not include a duty to guard against frightening horses under the circumstances presented. (*Id.* at p. 477.) Thus, the defendant, as a matter of law, did not breach its duty of care to the plaintiff. (*Id.* at p. 485.) We reached this conclusion by balancing the foreseeability of harm against relevant public policy considerations, including "the social utility of the defendant's conduct, and the consequences to the community of imposing a duty to guard against frightening [horses]." (*Id.* at p. 476.) We, however, acknowledged that the defendant could have been negligent for failing to guard against frightening horses under different factual circumstances. (See *id.* at pp. 477-478.)

We have also applied these same principles in affirming summary judgment for defendants in the premises liability context. In *Sharon P.*, an assailant attacked the plaintiff in an underground parking garage. The plaintiff sued the owner of the premises and the operator of the parking garage, alleging, among other things, that the defendants negligently failed to provide adequate security. (*Sharon P., supra*, 21 Cal.4th at p. 1185.) Although we acknowledged that the defendants had a duty to protect the plaintiff " 'against *foreseeable* criminal acts of third parties' " (*id.* at p. 1189, quoting *Ann. M., supra*, 6 Cal.4th at p. 674), we affirmed summary judgment for the defendants (*Sharon P.*, at p. 1199). To reach this result, we balanced the foreseeability of the attack against the efficacy of additional security measures and the resulting burden on the defendants. (See *id.* at pp. 1189-1199.) Based on this balancing, we concluded that the defendants had no duty to provide additional security measures under the undisputed facts. (*Ibid.*) Thus, the defendants, as a matter of law, did not breach their general duty of care to the plaintiff. (See *id.* at p. 1199.) We, however, implicitly recognized that a legal duty to provide additional security measures might exist under different facts, i.e., if there had been "prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location." (*Ibid.*; see also *Ann M., supra*, 6 Cal.4th at pp. 679-680 [the defendant had no duty to provide security guards absent notice of prior similar incidents].)

Thus, our case law establishes that public policy considerations may justify the definition of a more specific standard of care than the reasonably prudent person standard in certain cases where the relevant facts are undisputed. In such cases, a court may properly grant summary judgment for a defendant if the more specific standard establishes that the defendant could not have breached his legal duty as a matter of law. This is such a case.

I begin by considering the foreseeability of harm in the context of this case. Foreseeability must be analyzed "in terms of the totality of the circumstances facing the police officer at the scene." (*Dutton v. City of Pacifica* (1995) 35 Cal.App.4th 1171, 1175 [41 Cal.Rptr.2d 816] (*Dutton*).) In the traffic enforcement context, any assessment of foreseeability must account for the inherent risk created by a routine stop because "neither police nor their employer [may] incur any liability by virtue of" the "original police decision to stop . . . a suspected wrongdoer." (*Sparks v. City of Compton* (1976) 64 Cal.App.3d 592, 596 [134 Cal.Rptr. 684] (*Sparks*).) Any traffic enforcement stop "carries a risk of harm that a" negligent third party driver "will crash into the stopped vehicles." (*Whitton v. State of California* (1979) 98 Cal.App.3d 235, 242 [159 Cal.Rptr. 405, 17 A.L.R.4th 886].) Thus, the foreseeability of harm created by an officer's execution of a stop must be measured in relation to the foreseeability of harm inherent in a routine stop. Otherwise, officers may be held liable for their *decision* to stop a suspected traffic violator and become insurers of the motorists they stop. (*Ibid.* [holding officers liable for the risks inherent in any traffic enforcement stop would result in "a liability-extending doctrine of 'risk in the air' "].)

These principles establish that the foreseeability of harm created by Officer Hedgecock's decision to stop plaintiffs in the median area was minimal to nonexistent. The relevant facts are undisputed. The weather was dry and visibility was good. The car occupied by plaintiffs was parked well within the median area. The median area was wider than the right shoulder, and the right shoulder was adjacent to a downward slope. Contrary to the general pronouncements of plaintiffs' expert, no admissible evidence in the record even suggests that a car parked in this particular median area was in fact less visible than a car parked on the right shoulder or that the driver of the truck that hit plaintiffs was in fact distracted by the presence of a vehicle in the median area. Although plaintiffs' expert observed that traffic in the lane closest to the median generally travels faster than traffic in the lane closest to the right shoulder, the record establishes that traffic in the number one lane was travelling only minimally faster than traffic in the other two lanes. Moreover, traffic in all lanes was moderately heavy. Finally, Officer Hedgecock had stopped traffic violators in the median area on numerous occasions without incident, and there was no evidence that accidents were

more likely in the median area than on the right shoulder. Under these facts, the risk of harm to plaintiffs was no different from the risk of harm inherent in any traffic stop. Indeed, stopping plaintiffs on the right shoulder as suggested by the Safety Manual arguably would have *increased* the likelihood of harm to plaintiffs because they would have had to cross two busy lanes of traffic to reach the right shoulder. Holding that Officer Hedgecock might have breached his legal duty to plaintiffs under these circumstances creates the type of " 'Monday-morning quarterbacking' " that negligence law should avoid. (See *Dutton v. City of Pacifica, supra*, 35 Cal.App.4th at p. 1175, quoting *Williams v. State of California* (1983) 34 Cal.3d 18, 30 [192 Cal.Rptr. 233, 664 P.2d 137] (conc. and dis. opn. of Mosk, J.).)

The countervailing policy considerations also strongly support such a conclusion. By enacting numerous statutes relating to traffic safety (see, e.g., Veh. Code, §§ 21000-23336), and by making police officers statutorily immune for their decision to stop a suspected traffic violator (Gov. Code, § 820.2; *Sparks, supra*, 64 Cal.App.3d at p. 596), the Legislature has established a strong public policy in favor of enforcing the rules of the road. Indeed, rigorous enforcement of our traffic laws serves a vital public function by making "automobile driving less dangerous." (*Breithaupt v. Abram* (1957) 352 U.S. 432, 439 [77 S.Ct. 408, 412, 1 L.Ed.2d 448].) Where, as here, the location of the stop was *no more dangerous* than any other available location, holding that an officer *could* breach his legal duty by stopping a traffic violator in one of those locations would create a "Catch-22" situation. No matter where the officer stopped the violator, he would arguably create a risk of harm and open himself and his employer to liability. Indeed, the majority carefully avoids any suggestion that Officer Hedgecock could have escaped liability by stopping plaintiffs on the right shoulder and offers no alternative location for the stop. If officers may incur liability no matter where they stop a traffic violator, they have less incentive to make stops, resulting in the reduced enforcement of our traffic laws. Rather than impede such police work, I would conclude that Officer Hedgecock, as a matter of law, satisfied his duty of care to plaintiffs under the circumstances presented here. (See *Parsons, supra*, 15 Cal.4th at p. 476 [holding that the social utility of defendant's conduct overrode the foreseeability of harm].)

The Safety Manual does not dictate a contrary conclusion. Although the manual states a preference for stopping traffic violators on the right shoulder, it allows for officer discretion. For example, the manual's consistent use of the word "should"—rather than "shall"—implies that officers have discretion when deciding where to conduct a traffic enforcement stop. The manual also states that an officer, *"if possible*," should "ensure a violator does not . . . park in the median divider." Finally, the manual specifically

addresses the situation where "a violator stops in the center divider" and states that the officer must decide whether the hazards of conducting the stop in the center median are greater than the hazards of moving the violator across multiple freeway lanes. Although this provision ostensibly covers situations where the violator stops in the median on his own volition, it implies that officers must do the same calculation when deciding where to stop a violator travelling in the lane farthest from the right shoulder. Because the manual does not conflict with my conclusions above, the admissibility of the manual as evidence of the standard of care (see *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, 588 [86 Cal.Rptr. 465, 468 P.2d 825]), does not preclude us from affirming summary judgment in defendants' favor on the uncontroverted facts.

Indeed, the majority's contrary conclusion will likely cause more problems than it will solve. By holding that discretionary provisions in a manual preclude summary judgment under the facts of this case, the majority creates a huge incentive for government agencies to discard or sanitize their manuals in an effort to minimize the possibility of open-ended tort liability. Such a result will likely have deleterious effects by depriving government employees of useful guides for doing their jobs.

The majority's reliance on the cited provisions of the Safety Manual may also have the perverse effect of increasing the number of accidents. (See *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 273 [80 Cal.Rptr.2d 196][declining to impose a duty that would "likely result in more deaths or injuries"].) By ignoring the undisputed facts and reversing summary judgment solely based on the manual's suggestion to stop traffic violators on the right shoulder, the majority, in effect, creates a legal presumption for traffic stops on the right shoulder. As a result, officers will likely conduct *all* traffic stops on the right shoulder even though they are more familiar with the roads they patrol than this court. Where, as here, the right shoulder arguably creates a greater risk of accident than the median area, this judicially imposed limitation on officer discretion will likely increase the risk of harm. Consequently, the majority will likely cause more accidents than it prevents because its failure to provide officers with any meaningful guidance does nothing to reduce the possibility of such accidents.

The facts in this case are tragic, and I, like my colleagues, have great sympathy for plaintiffs, who suffered severe injuries through no apparent fault of their own. Nonetheless, I do not believe that Officer Hedgecock or the State of California should be held responsible for these injuries. Holding that a jury could find that Officer Hedgecock breached his legal duty under the facts of this case will not reduce the likelihood of such accidents in the

future. Instead, such a holding will likely hinder enforcement of our traffic laws and may even increase the number of accidents. While I might conclude differently under another set of facts, I believe that Officer Hedgecock had no duty to stop plaintiffs in a different location under the undisputed facts presented here. Accordingly, he did not, as a matter of law, breach his legal duty to plaintiffs.

Baxter, J., concurred.