[No. B209176. Second Dist., Div. Six. May 18, 2010.]

MELISSA CAMP, Plaintiff and Appellant, v.
STATE OF CALIFORNIA et al., Defendants and Appellants.

## COUNSEL

Stolpman, Krissman, Elber & Silver, Thomas G. Stolpman and Donna Silver for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, James M. Schiavenza and Mark A. Brown, Deputy Attorneys General; and Barbara A. Noble for Defendants and Appellants.

OPINION

**YEGAN, Acting P. J.**—Police routinely respond to emergencies, but they do not have a "legal duty" to do so. By that, we mean that an officer's failure to respond to a request for assistance will not result in tort liability for the officer even if a member of the public is injured by the officer's failure to act, i.e., his or her nonfeasance. If they do respond and their affirmative acts negligently cause harm to a person in need of assistance, their misfeasance may create a special relationship and result in tort liability As we shall explain, this tragic case involves an officer's nonfeasance that did not alter the risk of harm to the person in need. Based upon California Supreme Court precedent, there is no basis for tort liability.

Melissa Camp, Lori Baker and Ray Medina, in various stages of intoxication, were passengers in Ryan Funk's car when he drove it off a country road near Santa Maria. The car rolled over and came to rest, upright, in a dirt field. Funk was also intoxicated at the time. When California Highway Patrol (CHP) Officers Frank Lewis and Steven Koenig arrived to investigate the accident, Camp was lying on the ground near the car. Baker and Medina were sitting in the front seat. Funk was standing near the road. Lewis asked each of the three passengers several times whether they were injured and needed an ambulance. Baker and Medina said they were not injured. More importantly, each time Lewis asked Camp if she was injured or wanted an ambulance, she denied she was injured and declined the ambulance. Lewis did not call for one. A friend arrived to drive the passengers home. Medina picked Camp up off the ground and carried her to the friend's car. Within a few hours, Camp was hospitalized with severe spinal cord injuries. She now suffers from paraplegia.

Camp sued the State of California and Officer Lewis, on the theory that her paraplegia was caused not by Funk's driving under the influence of alcohol, but by Lewis's negligence. A jury awarded Camp $2,690,608 in damages. The State and Lewis appeal. They contend that Lewis owed no duty to Camp, they are immune from liability under various provisions of the Health and Safety Code and the Government Code, and that Lewis did not breach any duty or proximately cause Camp's injuries. Camp cross-appeals, contending the trial court erred when it apportioned 70 percent of the fault for her injuries to the drunk driver. We conclude that Lewis owed no duty to Camp. Accordingly, we reverse the judgment and direct the trial court to enter judgment in favor of the State and Lewis. We need not and do not reach the other contentions with respect to either the appeal or the cross-appeal.

*Facts*

Funk, Medina, Baker and Camp went out drinking together one night after work. When the bar closed at 2:00 a.m., they agreed that Funk would drive them all home in his car, even though he was intoxicated.[1] Camp sat in the backseat, behind the driver. As Funk sped along a backroad, he missed a curve. The car went off the road, hit an embankment and rolled completely over before coming to rest, upright, in a dirt field. Funk and Baker were not injured. Medina suffered only a slight head wound. Although not apparent at the scene, Camp sustained a highly unstable burst fracture of the 11th thoracic vertebra, with the immediate loss of all three columns of bone support that protect the spinal cord.

Funk, Medina and Baker all got out of the car. Funk used Medina's cell phone to call 911 and his father. During his 911 call, Funk can be heard asking his passengers if they are all right and then assuring the dispatcher that, "Everyone's okay." Baker called her boyfriend, Marcelino Morales, to come pick them up. She said nothing to Morales about Camp being injured.

CHP officers responded to the reported noninjury accident and saw Funk walking around near the road. Medina and Baker were sitting in the front seat of the car. Camp was lying on the ground near the car. No one saw Camp get out of the car. No one remembered helping her out and no one, including Camp, knew how she moved from the backseat to the ground. No one saw blood on Camp or noticed whether her clothes were ripped or stained. No one was aware of the extent of Camp's injuries and none of the car's occupants thought Camp was seriously injured.

Funk testified that, before the CHP officers arrived, he "leaned down over [Camp] and asked if she was okay. [¶] . . . She was moaning a little bit, and I asked her if she hurt, and she just told me 'everywhere.' " Funk did not see Camp move from the spot where she was lying, except that she was "moving her legs, wiggling them back and forth."

Medina testified that Camp was lying on her side, just a few inches from the car. He heard Camp moaning, but did not hear her speak. When the CHP officer asked Camp questions, Medina only heard her respond by moaning. Medina did not see Camp move.

Baker testified that Camp was lying flat on her back, five to 10 feet from the car. She overheard the CHP officer asking Camp questions. Camp's only

---

[1] Funk failed the field sobriety tests later administered by CHP Officer Koenig. A preliminary alcohol screening test measured his blood-alcohol level at 0.150 percent. It was also determined that Camp's blood-alcohol level was 0.227 percent when she was taken to the hospital later that evening.

response was to moan. Baker nevertheless estimated that the conversation lasted about five minutes. She testified that she saw glass and other debris in Camp's hair but not any blood.

The CHP officers agreed that Koenig would take primary responsibility for the driving under the influence investigation and the driver, while Lewis checked on the car and the passengers, and gathered information about the accident. Lewis is a certified emergency medical responder and has training in evaluating whether persons involved in an accident require medical assistance. As he walked toward the car, Lewis saw two people sitting in the front seat, and one person lying on the ground near the car. Lewis called out, asking if anyone was hurt. At least two people answered, "No." He asked, "Does anyone want an ambulance?" Again, at least two voices answered, "No."

When Lewis reached the car, he could see that there was damage to the car's roof and that no one could sit in the backseat. He shone his flashlight on Camp, who was lying on the ground. When he got to her head, he bent over her and asked if she was hurt. She responded, "No." He asked whether she wanted an ambulance and she said, "No." Lewis told Camp that he needed to get her identifying information and take a statement from her. He spoke with her for three to five minutes. She was cooperative and gave him all of the information he asked for. While they were talking, Camp raised her head, looked at Lewis and then brushed her hair out of her face and behind one ear. Camp did not moan, complain of back pain or complain that she had lost feeling in her legs. There was no evidence of physical injury apparent to Lewis.

Lewis also interviewed Medina and Baker who were seated in the car's two front seats. Neither passenger voiced any concern about Camp or asked Lewis to summon an ambulance for her. Lewis went back to speak to Camp. He again asked her whether she was hurt and if she wanted an ambulance. Camp answered "No." Lewis did not see Camp move or sit up during the 15 minutes that he was at the car interviewing her and the other passengers. He knew that she had been drinking alcohol but described her speech as clear and her eyes as appearing to focus when he was speaking to her. Lewis did not ask Camp to sit up or to move. He "didn't have a reason to. She said she wasn't hurt." The parties stipulated that Lewis "concluded that [Camp] had not been injured and did not need medical assistance." After Lewis finished interviewing the passengers, he went back to the patrol car to share his notes with Koenig.

Baker's boyfriend, Morales, arrived to drive the passengers home. Lewis walked back across the field toward the car, to tell the passengers their ride

had arrived. Medina testified that, when Lewis reached the car, he ordered them to leave and told them that they could be arrested for being drunk in public if they did not. Lewis denied ordering the passengers to leave or threatening them with arrest. He testified that, as he approached the car, he could see Baker walking toward Morales, and Medina searching for something on the front seat and floorboard of the car. Lewis used his flashlight to illuminate the area for Medina, and then looked back in the other direction, to check on Baker and Morales. When he turned around again, Lewis saw Camp "on her feet with her arms around Mr. Medina's neck." She was leaning against Medina who then "reached down underneath and picked her up." Lewis did not see Camp stand up, nor did he see her move her legs. As Medina was carrying Camp back to Morales's car, Lewis, for the fifth time, asked her if she was hurt and if she wanted an ambulance. Camp answered "No" to both questions. Medina put Camp in Morales's car and the group left.

Medina testified that he carried Camp to Morales's car because, "I wasn't going to let no one get a drunk in public." When asked whether Lewis told him to carry Camp, Medina responded, "No I did it all myself." He carried Camp because she could not walk. Medina believed he had asked Camp to get up and then decided to carry her because she was unable to do so. He did not tell Officer Lewis that he thought Camp was injured because, "I didn't believe it." Medina explained that he was drunk at the time. He never formed an opinion about whether Camp was injured or whether she was intoxicated herself. "I couldn't pass judgment, because I was so intoxicated myself." Medina explained that he did not think one way or the other about Camp's condition. "I didn't think anything. I just thought maybe she was laying there. She was trying to get over the pain." He did not tell Lewis that Camp was unable to stand or walk and he did not ask Lewis to call an ambulance for her.

Koenig, Lewis's partner, had no contact with the passengers until he saw them walking toward Morales's car. Medina was carrying Camp. Koenig approached them and asked if they were okay. "They both looked at [Koenig] and said that they were fine." Koenig made eye contact with Camp. She did not complain about being in pain. She was not moaning and did not appear to have trouble breathing. Koenig did not hear Lewis order anyone to leave the scene or threaten anyone with arrest. He was concentrating on investigating whether or not Funk should be arrested for driving under the influence. He was arrested for misdemeanor driving under the influence, i.e., without having inflicted bodily injury upon another.

*Jury Findings*

The jury made the following findings in response to a detailed special verdict form: Lewis was negligent in ordering the passengers to leave the scene, but he did not threaten to arrest them. Lewis's order was a substantial factor in aggravating the injuries Camp sustained in the accident. Lewis was also negligent in conducting "the assessment of [Camp's] condition at the scene of the accident," and his negligence was a substantial factor aggravating her injuries. Camp denied she was injured and said she did not want an ambulance. Lewis was not reasonable when he concluded that Camp was uninjured. His assessment of Camp's condition created, "an expectation of reasonable reliance on [his] actions by [Camp]." Lewis's assessment of Camp's condition at the scene increased the risk of harm to Camp. The jury attributed 15 percent of the combined negligence to Lewis, 13 percent to Camp, 2 percent to Medina and the remaining 70 percent to the driver, Ryan Funk.

*Posttrial Motions*

The State and Lewis filed both a motion for judgment notwithstanding the verdict and a motion for new trial contending that Lewis owed no duty of care to Camp and was immune from liability under Health and Safety Code section 1799.106 and various provisions of the Government Code.

The trial court denied both motions. With respect to the duty issue, the trial court concluded that Lewis voluntarily assumed a duty of care toward Camp when he began to "manage" the accident scene and when he ordered the passengers to leave. Lewis was obliged, the trial court reasoned, to protect Camp from the foreseeable risk that Medina would move her from the field in an unsafe way, aggravating the injuries she had received in the crash. The trial court concluded that Lewis was not immune from liability under Health and Safety Code section 1799.106 because the statute does not immunize grossly negligent conduct and "there is substantial evidence in the record to support meeting the gross negligence standard set forth in Health & Safety Code section 1799.106 with respect to Lewis' 'scene management assessment' . . . ."

*Contentions*

The State and Lewis appeal. As to duty, they contend the judgment should be reversed because Lewis owed no duty to Camp, except to respect her decision to decline medical treatment. If he owed her any duty at all, it was discharged when he asked whether she wanted an ambulance. Camp contends that Lewis owed and breached a duty of care toward her by (1) managing the

accident scene, (2) failing to conduct a reasonable assessment of her medical condition, unreasonably accepting her denial of injury, and not ordering an ambulance for her because she was not competent to decline medical care and (3) ordering her to leave the accident site.

*Duty*

■ "The existence of a duty of care is a question of law to be determined by the court alone. (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624] . . . .) This is because 'legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334].) Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. (*Dillon* v. *Legg* (1968) 62 Cal.2d 728, 734 [44 Cal.Rptr. 193, 401 P.2d 665].)" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 265 [80 Cal.Rptr.2d 196], citations omitted.)

■ The general rule is that, "one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act." (*Williams v. State of California* (1983) 34 Cal.3d 18, 23 [192 Cal.Rptr. 233, 664 P.2d 137].) A police officer, paramedic or other public safety worker is as much entitled to the benefit of this general rule as anyone else. (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185 [7 Cal.Rptr.3d 552, 80 P.3d 656]; see also *Zepeda v. City of Los Angeles* (1990) 223 Cal.App.3d 232 [272 Cal.Rptr. 635].) Thus Lewis had no duty to even talk to the car's occupants, inquire about injury, or summon personnel to do a medical assessment. Liability may, however, be imposed "if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so [citations], or if an officer undertakes affirmative acts that increase the risk of harm to the plaintiff." (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129 [119 Cal.Rptr.2d 709, 45 P.3d 1171].)

■ California courts have found no duty of care and have denied recovery "for injuries caused by the failure of police personnel to respond to requests for assistance, the failure to investigate properly, or the failure to investigate at all, where the police had not induced reliance on a promise, express or implied, that they would provide protection." (*Williams v. State of California, supra*, 34 Cal.3d at p. 25.) Similarly, the Court of Appeal in *Zepeda* held "paramedics had no general duty to render aid to [a gunshot victim]. . . . [T]he emergency personnel involved did not create the peril to

[the victim], they did not voluntarily assume a special duty to assist him, they made no promise or statement to induce reliance, nor did they increase the risk to him that otherwise would have existed." (*Zepeda v. City of Los Angeles, supra*, 223 Cal.App.3d at p. 236.)

■ We recognize that, "one's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716 [110 Cal.Rptr.2d 528, 28 P.3d 249].) As applied to law enforcement personnel, this general rule means that an officer "has a duty to exercise reasonable care for the safety of those persons whom the officer stops, and . . . this duty includes the obligation not to expose such persons to an unreasonable risk of injury by third parties." (*Id.* at p. 718.) Thus, the court in *Lugtu* found that a CHP officer owed a duty of care to passengers in a car pulled over for speeding, where the officer directed the driver to stop in the center median of a freeway and the stopped car was then struck by another vehicle. "[A] police officer who exercises his or her authority to direct another person to proceed to—or to stop at a particular location, owes such a person a duty to use reasonable care in giving that direction, so as not to put the person in danger or to expose the person to an unreasonable risk of harm." (*Id.* at p. 717.) The Supreme Court describes this as "affirmative conduct" or misfeasance, which may create a special relationship between the officer and the other person that may support a finding of duty. (*Id.* at pp. 716–717.) In contrast, no such special relationship exists where the officer's failure to act or nonfeasance does nothing to alter the risk of harm to the other person. This is nonfeasance which will not support a finding of duty. (*Id.* at p. 716.)

The nonfeasance line of cases is exemplified in *Minch v. Department of California Highway Patrol* (2006) 140 Cal.App.4th 895 [44 Cal.Rptr.3d 846]. There, the Court of Appeal ruled that CHP officers owed no duty of care toward a tow truck operator who was hit by a passing motorist while walking toward his truck to retrieve a receipt book for business purposes. The court held that the CHP officers owed no duty of care because they did not direct the operator to stay at the accident site after he finished extracting a car from a ditch, nor did they tell him where to park his tow truck or where to walk. (*Id.* at p. 906.) There was no "special relationship" between the officers and the tow truck operator because the officers did not promise to protect the operator. The operator also could not reasonably have relied on them for protection because he knew, by the time the accident occurred, that they were no longer directing traffic around the site. (*Id.* at pp. 906–907.)

■ A duty of care may arise where the evidence demonstrates "the requisite factors to a finding of special relationship, namely detrimental

reliance by the plaintiff on the officers' conduct, [or on] statements made by them which induced a false sense of security and thereby worsened [the plaintiff's] position." (*Williams v. State of California, supra,* 34 Cal.3d at p. 28.) A special relationship is not established "simply because police officers responded to a call for assistance and took some action at the scene." (*Adams v. City of Fremont, supra,* 68 Cal.App.4th at p. 279.) Nor is it "enough to assert that the law enforcement officers took control of the situation." (*Minch v. Department of California Highway Patrol, supra,* 140 Cal.App.4th at p. 905.) Instead, special relationships have been found only in "a limited class of unique cases" involving "police officers who made misrepresentations that induced a citizen's detrimental reliance [citation], placed a citizen in harm's way [citations], or lulled a citizen into a false sense of security and then withdrew essential safety precautions [citation]." (*Adams,* at pp. 279–280.)

The trial court here concluded that Lewis was in a position similar to that of the CHP officer at issue in *Lugtu.* In *Lugtu,* the CHP officer directed a driver to stop at a particular location and the passengers were injured by the reasonably foreseeable negligence of a passing motorist. Here, the trial court reasoned, Lewis directed Camp to leave a particular location and she was injured by Medina's reasonably foreseeable negligence in picking her up and carrying her across the field.

The trial court also concluded that Lewis managed or controlled the accident scene "for the benefit of the general public and the safety of those present." He knew that plaintiff claimed she was not injured and that she did not move while the investigation was underway. Under these circumstances, the trial court found, Lewis should not have "credited" Camp's statements denying injury. "Taking control of the scene in this context, and issuing an 'order to leave' under the color of authority gave rise to an increased expectation of reliance by the plaintiff on Officer Lewis' scene management and placed plaintiff in peril, increasing the risk of harm in a reasonably foreseeable manner."

Because the "existence of a duty is a question of law for the court," we "determine de novo the existence and scope of the duty" owed by Lewis to Camp. (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674 [25 Cal.Rptr.2d 137, 863 P.2d 207]; see also *Phillips v. TLC Plumbing, Inc.* (2009) 172 Cal.App.4th 1133, 1139, 1141 [91 Cal.Rptr.3d 864].) We conclude that the trial court erred as a matter of law and that Lewis did not owe a duty of care to Camp.

There is no evidence that Lewis "voluntarily assume[d] a duty to provide a particular level of protection [to Camp], and then fail[ed] to do so . . . ."

(*Zelig v. County of Los Angeles, supra,* 27 Cal.4th at p. 1129.) To the contrary, the record discloses that Lewis asked Camp whether she was injured and wanted an ambulance and then asked for her identifying information. In doing so, Lewis "responded to a call for assistance and took some action at the scene." (*Adams v. City of Fremont, supra,* 68 Cal.App.4th at p. 279.) This is not sufficient to support a finding that Lewis's affirmative acts increased the risk of harm to Camp. For example, there is no evidence that Lewis told Camp he would take care of her, protect her, summon medical care for her despite her wishes, or help her in any other way. He did not order Camp to lie on the ground, physically move Camp himself, or order Medina to pick her up and carry her to Morales's car. He did not ignore any statement that Camp was injured or any request that an ambulance be called for her. Instead, he left Camp in the same position as she was in when he arrived at the scene. He honored her repeated assurances that she was not injured and did not want an ambulance. The fair and only inference to be drawn here is that, in fact, Lewis did not believe that she was injured at all. This is buttressed by the crucial fact that Funk was only arrested for misdemeanor driving under the influence, i.e., without causing bodily injury.

Lewis's conduct in "managing the scene" is not sufficient to create a duty of care. As we have already noted, law enforcement personnel do not acquire a duty of care toward a citizen by responding to a request for assistance or undertaking an investigation. (*Williams v. State of California, supra,* 34 Cal.3d at p. 25.) To create a special relationship and a duty of care, there must be evidence that the police "made misrepresentations that induced a citizen's detrimental reliance [citation], placed a citizen in harm's way [citations], or lulled a citizen into a false sense of security and then withdrew essential safety precautions." (*Adams v. City of Fremont, supra,* 68 Cal.App.4th at p. 280.)

■ Here, there is no evidence that Lewis made a misrepresentation on which Camp relied or that his actions placed her in harm's way. At most, the evidence demonstrates that Lewis relied on Camp's statements and that he did nothing to alter her position, literally or figuratively. For example, Lewis did not promise to call for an ambulance and then fail to do so. He did not tell Camp that he believed she was fine when he actually thought she was injured, or tell the others that it was all right to move her when he really thought she needed to remain still. Similarly, nothing in Lewis's "management" of the accident site altered the risk of harm for Camp. Lewis did not move Camp himself or order Medina to move her. He did not ignore anyone's statement that Camp was injured or needed help. Lewis arrived at an accident site and gathered information about the accident and those involved in it. This is not sufficient to create a special relationship or a corresponding duty of care. (*Adams v. City of Fremont, supra,* 68 Cal.App.4th at p. 279.)

At oral argument Camp stressed that the duty was created by Lewis's "negligent assessment" of the extent of her injuries. But this failure was nonfeasance that left Camp in exactly the position she occupied before Lewis arrived. It cannot be equated with affirmative conduct or misfeasance that induced her reliance or changed the risk of harm to her. In the present context, Lewis's nonfeasance cannot support a finding that he owed a duty of care.

■ With the benefit of hindsight and given the tragic aftermath of Funk's drunk driving, it is regrettable that Camp was so adamant in her repeated refusals of help and that Lewis was unable to prevail upon her with repeated offers of an ambulance. But he could not force her to cooperate with ambulance personnel or consent to medical treatment. Perhaps ambulance personnel could have persuaded Camp to cooperate but there is no objective reason to believe she would have changed her mind. Had Lewis asked her to sit up or move her legs, he might have discovered the true extent of her injuries and called an ambulance to the site notwithstanding her protests.[2] But as the court noted in *Adams*, law enforcement officers are not "professional Good Samaritans" subject to a malpractice claim "whenever their response falls short of ' "what reasonably prudent police employees would have done in similar circumstances." ' " (*Adams v. City of Fremont, supra*, 68 Cal.App.4th at pp. 274–275, quoting *Williams v. State of California, supra*, 34 Cal.3d at p. 24, fn. 3.)

This leaves the last basis argued by Camp, which, in theory, was an affirmative direction equatable with "misfeasance." The jury found that Lewis "ordered" the group from the scene of the accident. But there was no alternative. Camp was leaving in any event and the group had already arranged for transportation away from the field. No one was going to spend the night in the field. Phrased otherwise, either on her own power or with the aid of her companions, Camp was going to depart from the accident scene. The order to do so cannot, consistent with common sense, be the cause in fact of Medina's decision to carry her away.

For these reasons, we conclude Lewis owed no duty of care in "managing" the accident scene, in assessing Camp's physical condition after the accident, or in ordering her to leave the accident site. Because there was no misfeasance by Lewis he owed no duty to her. Having so concluded, it is not necessary for us to consider the parties' remaining contentions with respect to either the appeal or Camp's cross-appeal.

---

[2] This may also have been problematic. Had Officer Lewis asked her to get up, he may have increased the risk of harm to her.

*Disposition*

The judgment is reversed, and the trial court is directed to enter judgment in favor of appellants the State of California and Lewis. Appellants are awarded their costs on appeal.

Coffee, J., and Perren, J., concurred.

A petition for a rehearing was denied June 9, 2010, and the petition of appellant Melissa Camp for review by the Supreme Court was denied September 1, 2010, S183907.