Filed 11/25/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARITES MURPHY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>CITY OF PETALUMA et al.,<br><br>      Defendants and Respondents. | A168012<br><br>(Sonoma County<br>Super. Ct. No. SCV-267491) |

Marites Murphy sued the City of Petaluma and fire department paramedics Jude Prokop and Shay Burke for medical negligence after the two paramedics responded to the scene of a head-on automobile collision in which Murphy was involved. As we shall discuss, the distinctive feature of this case is that Murphy repeatedly told the paramedics she was not injured and did not want or need medical assistance, and she said so even after being warned she might have suffered a serious injury that was not yet symptomatic and being urged to accept transport to a hospital for examination by a physician. Accordingly, after concluding Murphy had the capacity to refuse medical treatment, the paramedics left the scene. Unfortunately, hours later, Murphy suffered a serious debilitating stroke attributable to a hypertensive crisis triggered by the collision. She subsequently filed this lawsuit alleging the paramedics owed her a duty of care, which they breached through gross negligence, to assess her medical condition and to arrange transport to a hospital. The trial court granted the defendants' motion for summary

1

judgment, ruling the paramedics did not assume a duty of care to provide Murphy with the medical assistance she claims was owed. We affirm.

## BACKGROUND

In February 2020, Murphy was involved in a head-on car collision in Petaluma. Fire Department Captain Jude Prokop and engineer Shay Burke, both licensed paramedics, responded to the scene. When they arrived, the two drivers were out of their vehicles and walking around.

Prokop was responsible for initially managing the accident scene and dealing with the individuals involved. He asked Murphy if she was involved in the collision and whether she was hurt or needed medical assistance. Murphy confirmed she was involved in the collision but stated she was not hurt and did not want or need medical assistance.

Burke then spoke with Murphy. Like Prokop, Burke asked Murphy questions to determine her involvement in the collision and whether she needed medical assistance. Murphy again confirmed she was the driver of one of the vehicles, stated she was not hurt, and repeated she did not want or need medical assistance. Although Murphy appeared annoyed that Burke was not attending to the other driver who was obviously injured, Burke told her she needed to speak to him. In response to additional questions, Murphy told Burke she had not hit her head during the collision, did not lose consciousness, was wearing a seatbelt at the time, and was " 'fine.' " He did not visually observe any signs of injury or that she was in pain. She did not display or complain of any common signs of a hypertensive crisis such as headache, blurred vision, nausea, projectile vomiting, or pupil dilation. And she did not display any signs of cognitive impairment.[1] She did not display

---

[1] In all significant collisions, like the one Murphy was involved in, fire department paramedics assess the "cognitive condition" of those involved.

2

any confusion, poor balance, signs of excessive anxiety, panic, or shock. She did not slur her words, appear or sound disoriented, or display repetitive speech patterns. Accordingly, on the Glasgow Coma Scale—used to measure a person's level of consciousness based on their ability to perform eye movements, speak, and move their body—Burke gave Murphy the highest possible score, meaning she was fully responsive and alert.

After Murphy continued to insist she was not injured and did not want or need medical assistance, Burke explained it was possible she had suffered an injury of which she was unaware, that manifestation of such injury could be delayed, and such injury could be life-threatening. Burke therefore recommended she accept transportation to a hospital where she could be examined by a physician as a precautionary measure. Murphy responded she was aware of the risks but again stated she was not injured and declined transportation to the hospital. Burke then advised Murphy of the potential signs of serious injury of which she should be aware.

Burke thereafter turned his attention to the other driver, who was being assisted by an EMT and was later transported to the hospital by ambulance.

After Burke addressed hazards at the accident scene, Prokop asked him to confirm no additional ambulance was needed. Accordingly, Burke returned to Murphy to ask if she had developed a headache or required any medical assistance. Murphy said she did not have a headache and again refused medical assistance. Burke again observed Murphy did not display any objective signs of injury or cognitive impairment.

---

This assessment is based on verbal exchanges with and visual observation of the individual and performed to determine if the individual is alert and oriented as to " 'place, time[,] and event.' "

3

Just before the paramedics left the scene, Prokop again spoke with Murphy, who was talking to an individual whose car had been parked alongside the roadway and was struck in a secondary collision. Prokop wanted final confirmation no additional ambulance was required. The individual confirmed he had not been involved in the primary collision, and Murphy again said she was fine and did not want or need medical assistance or transport to a hospital. At no time during his interactions with Murphy, did Prokop observe any signs of injury, cognitive impairment, or hypertensive crisis.[2]

Based on their observations and interactions with Murphy, Prokop and Burke concluded she was alert and oriented, had the capacity to understand her circumstances and the risks of refusing medical treatment, and she had expressly exercised her right to refuse such treatment.[3]

Prokop and Burke then left the scene, approximately 16 minutes after they had arrived.

Murphy, in turn, called her boyfriend, who drove her to his house, where she fell asleep. A few hours later, he was unable to wake her. It was subsequently determined she suffered a stroke in her sleep due to a

---

[2] It is standard practice for fire department paramedics to interact with individuals involved in an accident a number of times to determine if they need medical assistance, as an individual who does not initially believe they are seriously injured may begin to experience symptoms and conclude they need or desire medical attention.

[3] It is undisputed a " 'competent adult[,]' " which Murphy does not dispute that she was, " 'has the right to refuse medical treatment, even treatment necessary to sustain life.' [Citations.] This right is grounded both in state constitutional and common law. [Citation.] The right to privacy guaranteed by the California Constitution, article I, section 1 'guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity.' " (*In re Qawi* (2004) 32 Cal.4th 1, 14.)

hypertensive crisis caused by the collision. The stroke left Murphy with permanent brain damage, speech and language impairment, and paralysis of her right side. Murphy has no recollection of the collision or her interactions with either paramedic that day.

In February 2021, Murphy filed the operative complaint against the City for medical negligence under Government Code sections 815.2, subdivision (a) and 820, subdivision (a). She alleged Prokop and Burke were "grossly negligent in their medical examination, evaluation and treatment of [her]," including failing to conduct reasonable medical assessments, failing to examine and/or record various biomarkers, and failing to transport her to an emergency medical facility.[4] More specifically, she alleged Prokop and Burke were grossly negligent in failing to conduct any "reasonable medical assessment" to detect a potential brain injury or the presence of a

---

[4] Murphy alleged the paramedics were "grossly negligent" in accordance with Health and Safety Code section 1799.106, which states in pertinent part: "In addition to the provisions of Section 1799.104 of this code, Section 2727.5 of the Business and Professions Code, and Section 1714.2 of the Civil Code, and in order to encourage the provision of emergency medical services by firefighters, police officers or other law enforcement officers, EMT-I, EMT-II, EMT-P, or registered nurses, a firefighter, police officer or other law enforcement officer, EMT-I, EMT-II, EMT-P, or registered nurse who renders emergency medical services at the scene of an emergency or during an emergency air or ground ambulance transport shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith. A public agency employing such a firefighter, police officer or other law enforcement officer, EMT-I, EMT-II, EMT-P, or registered nurse shall not be liable for civil damages if the firefighter, police officer or other law enforcement officer, EMT-I, EMT-II, EMT-P, or registered nurse is not liable." (Health & Saf. Code, § 1799.106, subd. (a).)

hypertensive crisis.[5]  Defendants, alleged Murphy, "took no steps to assess [her] condition, nor to transport [her] to a medical facility capable of making the necessary medical assessment."

The City subsequently moved for summary judgment or adjudication on several grounds, including that, given Murphy's repeated refusals of medical assistance and offers of transport to a hospital for examination by a physician, the paramedics owed no duty to provide Murphy with the medical care she claims should have been provided.

Stating "the issue here is whether Prokop or Burke voluntarily assumed a duty to provide a particular level of protection to Plaintiff and then failed to do so," the court granted the City's motion.  The court ruled the "evidence does not establish that medical care was initiated; just that it was offered."  The paramedics did not, in other words, "take any action which created a duty to perform a full assessment of Plaintiff's medical condition." In short, under the undisputed circumstances—i.e., that Murphy repeatedly refused offers of medical assistance, including after she was urged to accept it—the paramedics did not owe Murphy a duty to provide such assistance.

## DISCUSSION[6]

"Liability for malpractice and negligence is based upon the defendant's breach of a legal duty of care.  (*Rainer v. Grossman* (1973) 31 Cal.App.3d 539,

[5]  In the introduction of her opening brief, she claims Prokop and Burke were grossly negligent "by leaving her at the scene without measuring her blood pressure."

[6]  Our standard of review is well established.  "We review an order granting summary judgment de novo.  [Citation.]  We consider all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.  [Citation.] [¶] To establish the action has no merit, a defendant moving for summary judgment must show 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action.'  (Code Civ. Proc.,

542. . . .)  Whether a defendant owes a duty of care is a question of law that is determined on a case-by-case basis.  (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 . . . ; *Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1610. . . .)"  (*McCurry, supra,* 104 Cal.App.5th at pp. 1175–1176.)

Murphy maintains defendants owed her a duty of care to provide medical assistance in accordance with Health and Safety section 1799.106 pursuant to the "negligent undertaking doctrine."

As recently discussed in *Golick v. State of California* (2022) 82 Cal.App.5th 1127, 1143–1146 (*Golick*), the negligent undertaking doctrine is one of the threads of analysis that address duty in connection with harm caused by a third party.  It is well established there is no general duty to protect others from the conduct of third parties.  (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 214; *Williams v. State of California* (1983) 34 Cal.3d 18, 23 (*Williams*).)  This no-duty-to-aid rule applies equally to emergency rescue personnel, including paramedics.  (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185; see *Golick,* at p. 1144.)

---

§ 437c, subd. (p)(2).)  We view the evidence in the light most favorable to plaintiffs as the losing parties, liberally construing their evidentiary submission while strictly scrutinizing [the defendant's] own showing.  We resolve any evidentiary doubts or ambiguities in plaintiffs' favor.  [Citation.] We accept as true the facts shown by plaintiffs' evidence and reasonable inferences from that evidence.  [Citation.] [¶] 'Summary judgment is appropriate only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (Code Civ. Proc., § 437c, subd. (c).)  A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment.' "  (*McCurry v. Singh* (2024) 104 Cal.App.5th 1170, 1175 (*McCurry*).)

The " 'no-duty-to-protect rule is not,' " however, " 'absolute,' as there are settled exceptions to it." (*Golick, supra,* 82 Cal.App.5th at p. 1144.) One line of authority turns on whether the defendant's actions increased the risk that a third party would harm the plaintiff. (*Id.* at p. 1145.) These cases flow from the "duty to exercise reasonable care for the safety of others" which includes "an obligation not to place another person in a dangerous situation or to expose the person to an unreasonable risk of harm." (*Ibid.*)

Another line of authority is predicated on "the negligent undertaking doctrine or the Good Samaritan rule." (*Golick, supra,* 82 Cal.App.5th at p. 1145.) Under this authority, "one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz v. State of California* (2000) 22 Cal.4th 550, 558–559 (*Paz*); see *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 249 (*Delgado*); *Golick,* at p. 1145.) "[I]f a volunteer who, having no initial duty to do so, undertakes to come to the aid of another, i.e., [is a] 'good Samaritan,' he or she is under a duty to exercise due care in performance. Such a volunteer is liable if (1) his or her failure to exercise due care increases the risk of harm[,] or (2) the harm is suffered because of the other's reliance upon the undertaking." (*Greyhound Lines, Inc. v. Department of California Highway Patrol* (2013) 213 Cal.App.4th 1129, 1136, citing *Williams, supra,* 34 Cal.3d at p. 23; *Golick,* at p. 1145.)

Thus, " ' "[t]he foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently." ' " (*Paz, supra,* 22 Cal.4th at p. 559.) " '[T]he scope of any duty assumed depends upon the nature of the undertaking.' " (*Golick,*

8

*supra,* 82 Cal.App.5th at p. 1146, quoting *Delgado, supra,* 36 Cal.4th at p. 249.)

It must further be shown that the defendant's acts increased the harm or risk of the harm inflicted by the third party. (*Golick, supra,* 82 Cal.App.5th at p. 1146.) "[T]o state a claim for affirmatively increasing a risk of harm," a plaintiff must demonstrate "a 'direct connection' between the [defendant's] challenged conduct and some risk of harm or heightened risk of harm [from the third party's wrongful conduct] that would not otherwise have arisen if not for the defendant's conduct." (*Id.* at p. 1147; *ibid.* [alleged connections between officer's conduct and third party's shooting spree were "little more than speculation" and insufficient to support a finding of duty under the negligent undertaking doctrine].)

Murphy maintains the paramedics, by virtue of their interactions with her at the scene of the accident, assumed a duty to provide her with appropriate medical care which, according to her allegations, included taking her vital signs, and specifically her blood pressure, and transporting her to a hospital for examination by a physician.

Murphy does not dispute she repeatedly told the paramedics she did not want or need medical assistance or transport to a hospital, including after she was advised she might have suffered a serious injury, indeed a life-threatening injury, the symptoms of which had not yet manifested themselves and was urged to accept transport to a hospital for examination by a physician. She maintains this is irrelevant, however, to the threshold issue of duty and the fact the paramedics interacted with her at all, i.e., to ask whether she was injured and assess whether she had the capacity to exercise her right to refuse medical assistance and transport to a hospital, sufficed to give rise to a duty to provide medical assistance meeting the

9

applicable standard of care. She variously asserts the paramedics "actually examined [her,]" "[b]y their own admission" they "conducted a visual and interactive assessment of [her] condition to look for signs of injury and/or cognitive impairment, and determine her Glasgow Coma Scale score," "they undertook to 'perform[] a visual and cognitive assessment" of her, and "the evidence readily supports a finding that [they] voluntarily undertook to examine [her] at the scene of the collision" and "therefore, owed [her] a duty of care under [Health and Safety Code] section 1799.106." According to Murphy, her refusals of medical assistance and transport to a hospital are relevant only to the issues of breach and whether the paramedics were "grossly negligent" in carrying out the duty to provide medical assistance they assertedly assumed on interacting with her.[7]

Defendants maintain they never had the opportunity to provide medical assistance and thus never assumed a duty to render such assistance consistent with the applicable standard of care—because Murphy repeatedly stated she did not want or need such assistance. Rather, as defendants see it, the extent of their interaction with Murphy—given her repeated refusals of medical assistance and transport to a hospital—was to assess whether she had, at that time, the cognitive capacity to exercise her right to refuse such assistance. Murphy makes no claim *that* assessment was performed negligently; indeed, she makes no claim that, at that time, she lacked the

_____

[7] Murphy points out she submitted her expert's declaration stating the paramedics' "examination" of her "omitted 'key portions' " of the applicable standard of care. The expert opined that because Murphy was involved in a "severe" head-on collision in which her air bag deployed and in which the other driver sustained "significant" injuries, the applicable standard "required the Paramedics to obtain Murphy's vital signs, including her blood pressure," and their failure to do so " 'was a gross deviation [from] the applicable standard of care.' "

capacity to refuse medical assistance.  Thus, defendants characterize Murphy's claim as predicated on the contention "that because Prokop and Burke undertook to determine whether [Murphy] was competent to reject medical assistance and emergency transportation to a hospital—which included verbal interactions with [Murphy] and visually observing the parts of [her] body they could see for any apparent injuries—they also somehow undertook a voluntary duty to perform a plethora of *other* medical examinations *and* to transport [Murphy] to a hospital in an ambulance."

Murphy relies on three first responder cases in support of her claim the paramedics' exchanges with her triggered a duty of care to render medical assistance consistent with Health and Safety Code section 1799.106.

The case on which she principally relies is *Wright v. City of Los Angeles* (1990) 219 Cal.App.3d 318 (*Wright*).  In *Wright*, the plaintiffs' decedent was in a fight, sustained injuries, and then collapsed in a parked car.  (*Id.* at p. 326.)  The first police officers to arrive at the scene dragged the decedent from the car, put him on the ground, handcuffed his hands behind his back, and, according to witnesses, kicked him to the gutter.  (*Id.* at pp. 326–327.) The officers called for an ambulance, which arrived minutes later.  (*Id.* at pp. 327, 332.)  Various witnesses at trial testified to the following: An officer and one of the paramedics approached the decedent, who was laying on his back or side, with his hands cuffed behind him.  (*Id.* at p. 337.)  The officer grabbed the decedent by his arm and "sat [him] up" for an examination by the paramedic.  (*Id.* at p. 332.)  The decedent did not respond to the paramedic's initial question, which he asked twice, of what happened.  (*Id.* at p. 337.)  The paramedic asked the decedent if he was hurt, and he said he was not.  (*Ibid.*) The paramedic performed what he called a "60-second examination," to see if the decedent had any life-threatening injuries.  (*Ibid.*)  This included lifting

11

the decedent's shirt to examine his front and back for signs of trauma and looking into his eyes with a flashlight. (*Id.* at pp. 332, 337.) The paramedic did not ask any questions to ascertain the decedent's mental orientation. (*Id.* at p. 337.) Nor did he suggest the decedent be transported to the hospital for further examination. (*Id.* at pp. 332, 337.) He told the officer the decedent "probably should see a doctor" and left the scene five minutes after arriving. (*Id.* at p. 337.) Minutes later an officer observed that the decedent was foaming at the mouth and a second ambulance was called. (*Id.* at p. 332.) By the time it arrived, the decedent was dead. (*Id.* at pp. 333–334, 336.) It was later determined the decedent died of complications caused by sickle cell anemia. (*Id.* at pp. 339–340.)

After a jury found the paramedic was grossly negligent and his negligence was a proximate cause of the decedent's death, the trial court granted a defense motion for judgment notwithstanding the verdict on the ground the paramedic owed no duty to have foreseen sickle cell complications. The Court of Appeal reversed. (*Wright*, *supra*, 219 Cal.App.3d at pp. 344, 348.)

With respect to duty, the appellate court observed the jury was instructed, in accordance with Health and Safety Code section 1799.106, that a paramedic has a general duty to perform medical services with the care and skill ordinarily used by paramedics under similar circumstances in the same or a similar locale.[8] (*Wright*, *supra*, 219 Cal.App.3d at pp. 343–344.) Thus,

---

[8] The jury was instructed: " 'It is the duty of one who undertakes to perform the services of a police officer or paramedic to have the knowledge and skills ordinarily possessed and to exercise the care and skill ordinarily used in like cases by police officers or paramedics in the same or similar locality and under similar circumstances. A failure to perform such duty is negligence. [¶] The standard to be applied in this case is gross negligence.

citing to Health and Safety Code section 1799.106, the court stated, "a basic duty was established for [the paramedic]—to provide his medical services in a manner which was not grossly negligent or performed in bad faith." (*Wright,* at p. 345.) Apparently, no objection was made to these instructions, indicating all parties agreed the paramedic had performed medical services. It is therefore not surprising the court did not identify as an issue before it whether, under the facts of the case, the paramedic had undertaken to provide medical services and thus owed a duty to provide such services consistent with the applicable standard of care. Rather, the court discussed the evidence, particularly the testimony of an expert witness who opined on the standard of care, stating it "support[ed] the conclusion that paramedics arriving at a location where there has been a fight and finding a patient lying

The term gross negligence means the failure to provide even scant care or an extreme departure from the ordinary standard of conduct.

" 'In performing professional services for a client, . . . a paramedic has the duty to have that degree of learning and skill ordinarily possessed by reputable paramedics practicing in the same or similar locality and under similar circumstances. [¶] It is his further duty to use the care and skill ordinarily used in like cases by reputable members of his profession practicing in the same or a similar locality under similar circumstances and to use reasonable diligence and his best judgment in the exercise of his professional skill and in the application of his learning in an effort to accomplish the purpose for which he was employed. A failure to perform any such duty is negligence.

" 'A police officer or a paramedic who rendered emergency medical services at the scene of an emergency shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions performed in bad faith. [¶] Emergency medical services includes but is not limited to first aid and medical services, rescue procedures and transportation or other related activities necessary to ensure the health or safety of a person in imminent peril.' " (*Wright, supra*, 219 Cal.App.3d at pp. 343–344.)

13

on the ground have the duty to make an examination which is sufficient to determine whether the patient has symptoms of any serious injuries which may likely result from a fight, such as shock, head injury or trauma, internal injuries or broken bones, and to treat those symptoms or take the patient to a hospital for treatment of the injury. It is reasonably foreseeable that failure to perform an examination sufficient to determine whether the symptoms of a serious injury are present could result in the failure to ascertain that a serious injury may exist and to treat or obtain treatment for that serious injury, which could result in further injury or death." (*Id.* at p. 346.)

Measured against this standard, the court went on to conclude there was sufficient evidence to support the jury's finding the paramedic had been grossly negligent in his examination of the decedent and sufficient evidence to support the jury's finding his negligence had been a proximate cause of the decedent's death. (*Wright*, *supra*, 219 Cal.App.3d at pp. 347–348.) On the latter point, there was expert testimony that had the paramedic checked the decedent's pulse and blood pressure, it would have indicated the decedent was in shock and treatment for shock would also have alleviated the sickle cell crisis. (*Id.* at p. 348.)

Thus, far from being on all fours with this case, as Murphy maintains, *Wright* involved a significantly different situation. The decedent in that case presented in a profoundly different condition than did Murphy. He was down on the ground and all but inarticulate. There was no exchange between the paramedic and the decedent as to whether he wanted medical assistance, and the decedent never told the paramedic he did not want such assistance, let alone say so repeatedly, as Murphy did. Unlike the paramedics in the instant case, the paramedic in *Wright* never made any assessment of the decedent's capacity to refuse medical treatment. The police officer who escorted the

14

paramedic to the decedent pulled the handcuffed decedent off the ground to a sitting position so the paramedic could examine his condition, which the paramedic cursorily did, including by pulling up the decedent's shirt and looking into his eyes with a flashlight. In other words, the paramedic in *Wright* undertook to provide a *medical* examination that an expert opined, and the jury found, fell seriously below the standard of care.

The second case to which Murphy cites is *Zepeda v. City of Los Angeles* (1990) 223 Cal.App.3d 232 (*Zepeda*). In that case, paramedics refused to render medical attention or otherwise assist a gunshot victim until police arrived at the scene, by which time the victim died. (*Id.* at p. 234.) The trial court sustained the defendants' demurrer to the complaint on the ground the allegations did not establish the paramedics owed the decedent any duty to provide medical attention or even " 'make [an] inquiry as to the status' " of the decedent. (*Id.* at p. 234.) The court explained, "we think it clear that the City's paramedics had no general duty to render aid to plaintiffs' decedent. Based upon the allegations of the complaint, the emergency personnel involved did not create the peril to decedent, they did not voluntarily assume a special duty to assist him, they made no promise or statement to induce reliance, nor did they increase the risk to him that otherwise would have existed. Said another way, the paramedics could not negligently perform an act they had not undertaken to perform, and to that extent plaintiffs' pleading is defective on its face." (*Id.* at p. 236.)

The court rejected the argument Health and Safety Code section 1799.107 "imposes a mandatory duty upon emergency rescue personnel to render assistance whenever summoned."[9] (*Zepeda*, *supra*, 223 Cal.App.3d at

---

[9] Similarly to Health and Safety Code section 1799.106, section 1799.107 provides in relevant part: "[N]either a public entity nor emergency

15

p. 236.) To the contrary, the court thought "it obvious that the statute does not impose a general duty upon emergency personnel to provide assistance whenever and wherever summoned. [Health and Safety Code section 1799.107,] [s]ubdivision (b) merely defines the level of negligence that will result in the imposition of liability once assistance is rendered." (*Id.* at p. 237.)

The court distinguished *Wright*. "In that case, the victim, who had been involved in an altercation with another suspect and was later arrested and handcuffed by the police, died from sickle cell shock after city paramedics summoned to the scene conducted only a cursory examination. In determining whether the defendants were liable, the Court of Appeal found that Health and Safety Code section 1799.106 established a duty for emergency personnel to provide 'medical services in a manner which was not grossly negligent or performed in bad faith.' [Citation.] The court then applied that standard in finding that the paramedics were grossly negligent in their treatment of the victim. [¶] . . . *Wright* does not hold that emergency personnel must respond to all calls for assistance from the general public or risk liability in tort. Indeed, such a holding would have had no application to the underlying facts. Unlike the instant case, the paramedics in *Wright* actually examined the victim and thus were held to the standard of care set forth in Health and Safety Code section 1799.106. Here, of course, the City's paramedics provided no form of assistance and were not obligated to do so

rescue personnel shall be liable for any injury caused by an action taken by the emergency rescue personnel acting within the scope of their employment to provide emergency services, unless the action taken was performed in bad faith or in a grossly negligent manner." (Health & Saf. Code, § 1799.107, subd. (b).) "The clear import of this language," observed the court, "is to limit, not expand, a public entity's liability exposure for providing emergency services to the public." (*Zepeda, supra,* 223 Cal.App.3d at p. 237.)

16

either by statute or common law rule." (*Zepeda, supra,* 223 Cal.App.3d at p. 237.)

The third case to which Murphy cites is *Camp v. State of California* (2010) 184 Cal.App.4th 967 (*Camp*). In that case, a group of friends in various states of intoxication were driving home from a bar when the driver (one of the intoxicated friends) missed a curve and the car went off the road, hit an embankment, and rolled over. (*Id.* at p. 971.) Two responding highway patrol officers found Camp, one of the passengers, lying on the ground near the car. (*Ibid.*) One of the officers, a certified Emergency Medical Responder, asked each of the three passengers several times whether they were injured and needed an ambulance. (*Id.* at pp. 970, 972.) Two said they were not injured. (*Ibid.*) Each time the officer asked Camp if she was injured or wanted an ambulance, "she denied she was injured and declined the ambulance," and the officer did not call for one. (*Ibid.*) A friend arrived to drive the passengers home, and one of the passengers picked Camp up off the ground and carried her to the friend's car. (*Ibid.*) Within a few hours, Camp was hospitalized with severe spinal cord injuries. (*Ibid.*) She filed a negligence action against the State and the officer who had not called an ambulance. (*Ibid.*) After a jury returned a verdict in her favor, the defendants filed motions for judgment notwithstanding the verdict and for a new trial, which were denied. (*Id.* at p. 974.) The Court of Appeal reversed the judgment, holding the highway patrol officer owed no duty to Camp. (*Id.* at p. 970.)

Pointing out the "general rule is that, 'one has no duty to come to the aid of another,' " the court explained the officer "had no duty to even talk to the car's occupants, inquire about injury, or summon personnel to do a medical assessment." (*Camp, supra,* 184 Cal.App.4th at p. 975.) Rather,

17

liability may be imposed only " 'if an officer voluntarily assumes a duty to provide a particular level of protection, and then fails to do so [citations], or if an officer undertakes affirmative acts that increase the risk of harm to the plaintiff.' " (*Ibid.,* quoting *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129.)  In other words, an officer may be held liable for "misfeasance," that is for performing the conduct the officer undertakes without the requisite care owed, but may not be held liable for "nonfeasance," that is for conduct the officer has not undertaken to provide.  (*Camp,* at pp. 978–979.) There was no evidence, said the court, the officer " 'voluntarily assume[d] a duty to provide a particular level of protection [to Camp], and then failed to do so. . . .' " (*Id.* at p. 977, quoting *Zelig,* at p. 1129.)  Nor was there any evidence the officer "made a misrepresentation on which Camp relied or that his actions placed her in harm's way." (*Camp,* at p. 978.)  "[N]othing in [the officer's] 'management' of the accident site altered the risk of harm to Camp." (*Ibid.*)  He "arrived at an accident site and gathered information about the accident and those involved in it.  This [was] not sufficient to create a special relationship or a corresponding duty of care." (*Ibid.*)

The court added that "[w]ith benefit of hindsight and given the tragic aftermath of [the driver's] drunk driving, it is regrettable that Camp was so adamant in her repeated refusals of help and that [the officer] was unable to prevail upon her with repeated offers of an ambulance.  But he could not force her to cooperate with ambulance personnel or consent to medical treatment. Perhaps ambulance personnel could have persuaded Camp to cooperate but there is no objective reason to believe she would have changed her mind." (*Camp, supra,* 184 Cal.App.4th at p. 979.)

Murphy argues *Zepeda* and *Camp* reinforce the significance of *Wright* to the case at hand and illustrate that a first responder owes no duty only

18

when the responder does nothing or next to nothing.  She maintains these cases reflect a "spectrum"—*Wright* illustrating when a first responder voluntarily assumes a duty to provide medical assistance with the requisite degree of due care, and *Zepeda* and *Camp* illustrating when a first responder does not assume such a duty—and asserts *Wright* is controlling here.

As we have discussed, *Wright* is far from the dispositive case Murphy urges.  Moreover, in *Camp,* the responding officer did more than nothing.  He investigated the crash scene and, more to the point, asked the intoxicated occupants of the rolled car whether anyone was hurt and whether anyone wanted an ambulance.  (*Camp, supra,* 184 Cal.App.4th at p. 972.)  He specifically shined his flashlight on Camp, bent over her, and asked if she was hurt and whether she wanted an ambulance.  (*Ibid.*)  She said " '[n]o' " to each question.  (*Ibid.*)  He then spoke with her three to five minutes, during which time she provided identifying information and information about the crash.  (*Ibid.*)  At no time did Camp "moan, complain of back pain or complain that she had lost feeling in her legs."  (*Ibid.*)  There was "no evidence of physical injury apparent to [the officer]."  (*Ibid.*)

*Camp* also reflects the duty first responders can assume under the negligent undertaking doctrine is tied to the " 'particular level of protection' " they provide to the plaintiff.  (*Camp, supra,* 184 Cal.App.4th at p. 977; see *Golick, supra,* 82 Cal.App.5th at p. 1146 [under the negligent undertaking doctrine, " 'the scope of any duty assumed depends upon the nature of the undertaking,' " quoting *Delgado, supra*, 36 Cal.4th at p. 249].)  In *Camp*, there was no evidence the officer "told Camp he would take care of her, protect her, summon medical care for her despite her wishes, or help her in any other way."  (*Camp,* at p. 978.)  In short, he owed no duty to do more than

19

he did given Camp's assertion she was not hurt and her refusal of medical assistance.

In our view, the extent and nature of the paramedics' interaction with Murphy is far closer to that of the officer's interaction with the injured passenger in *Camp* than it is to the conduct of the paramedic in *Wright*.

Murphy's position seems to be that, when it comes to paramedics, there is no "particular level of protection" gradient and as soon as a paramedic engages with a person involved in an accident and commences to "assess" the situation by asking whether the person is injured and wants medical assistance, the paramedic takes on a duty to provide *medical assistance* meeting the requisite standard of care. It is immaterial, she claims, that the person promptly states they do not want or need medical assistance. She thus asserts that regardless of the fact she repeatedly told the paramedics she was not injured and did not want or need medical assistance—and said so even after being advised she might have sustained a serious injury that had not yet manifested itself and after being urged to agree to ambulance transport to a hospital so she could be examined by a physician—she can sue the paramedics not only for failing to perform a medical examination meeting the requisite standard of care, but also for failing to call an ambulance to take her to the hospital for examination by a physician.

We conclude Murphy's position is inconsistent with the parameters of the negligent undertaking doctrine and, as with other first responders, the scope of the duty assumed by the paramedics must be measured by the "particular level" of service they provided. And more specifically in this case, the particular level of service was dictated by Murphy's repeated refusals of

20

medical assistance and transport to a hospital for examination by a physician.[10]

While Murphy does not dispute the paramedics' testimony she seemed "annoyed" when they continued to ask whether she wanted medical assistance or transport to a hospital, she argues she did not expressly refuse to be medically examined by Burke. She claims this fact, combined with the fact she participated in the exchange with Burke wherein he assessed her capacity to refuse medical assistance, suggests a trier of fact "could readily infer that Murphy would have allowed the Paramedics to conduct a more thorough examination—including taking her vital signs—had they attempted to do so." This argument misses the salient point—after Murphy stated, repeatedly, that she did not want or need medical assistance, Burke did not undertake a medical examination and therefore did not, under the negligent

_____

[10] We also note the recent decision in *McCurry, supra,* 104 Cal.App.5th 1170*,* in which the Court of Appeal held a cardiac specialist owed no medical duty of care to the plaintiffs' decedent. The specialist took a call from an emergency room physician at a different hospital who was seeking to transfer the decedent to a more specialized facility, and the two spoke briefly about the decedent's condition. The specialist initially agreed the decedent needed acute catheterization, but on being told additional facts about her condition, said she was not a candidate for the procedure. (*Id.* at pp. 1173–1174.) The plaintiffs maintained the specialist had " 'affirmatively participated' " in the decedent's care and therefore owed her a duty of due care. (*Id.* at p. 1176.) The Court of Appeal held otherwise. The specialist "never took charge of decedent's case or was employed to attend her." (*Id.* at p. 1177.) While the specialist offered the attending physician some opinions, "[h]is concluding not to treat [the decedent] did not create a physician-patient relationship because he did not affirmatively accept any responsibility for her care," and he therefore owed no duty to her. (*Id.* at p. 1178.) In short, until the specialist actually accepted the decedent as a patient and commenced providing medical care, he did not assume a physician's duty of due care to her.

undertaking doctrine, assume a duty to conduct such an examination meeting the applicable standard of care.

As we have recited, the cases also require more than a voluntary undertaking to provide aid to establish a duty under the negligent undertaking doctrine. A plaintiff must also show the defendant's conduct increased the harm, or the risk of the harm, inflicted by the third party. (*Golick, supra*, 82 Cal.App.5th at pp. 1146–1147; *Greyhound Lines, Inc. v. Department of California Highway Patrol, supra,* 213 Cal.App.4th at p. 1136.)

Again, the analysis in *Camp* is apposite. In that case, the officer "did not promise to call for an ambulance and then fail to do so. He did not tell Camp that he believed she was fine when he actually thought she was injured or tell the others it was all right to move her when he really thought she needed to remain still. Similarly, nothing in [the officer's] 'management' of the accident site altered the risk of harm for Camp. [The officer] did not move Camp himself or order [the other passenger] to move her. He did not ignore anyone's statement that Camp was injured or needed help. [He] arrived at an accident site and gathered information about the accident and those involved in it." (*Camp, supra,* 184 Cal.App.4th at p. 978.) The officer left Camp "in exactly the position she occupied before [he] arrived." (*Id.* at p. 979; see *Zepeda, supra,* 223 Cal.App.3d at p. 236 [emergency personnel "did not create the peril to decedent, they did not voluntarily assume a special duty to assist him, they made no promise or statement to induce reliance, nor did they increase the risk to him that otherwise would have existed"].)

The same can be said here. The paramedics did not make Murphy any promises with respect to medical assistance, let alone fail to follow through on such promises. They did not ignore any requests for such assistance. To

22

the contrary, they urged her to let them provide medical assistance and warned her that symptoms of a serious, even life threatening, injury could be delayed. She nevertheless reiterated she did not want medical assistance or transport to a hospital for examination. And while Murphy claims the paramedics failed to conduct a medical assessment sufficient to detect a potential brain injury or hypertensive crisis, the crisis she subsequently experienced was caused by the collision. As in *Camp*, the paramedics left Murphy "in exactly the position she occupied" before they arrived at the scene. (*Camp, supra*, 184 Cal.App.4th at p. 978.)

We therefore conclude, given the undisputed facts in this case, the trial court correctly ruled the paramedics did not, under the negligent undertaking doctrine, have a duty to render medical assistance to Murphy in accordance with the standard of care applicable such assistance.

### III. DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

_____
Banke, Acting P.J.

We concur:


_____
Langhorne Wilson, J.


_____
Hill, J.*


*Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A168012, *Murphy v. City of Petaluma*

Trial Court: Sonoma County Superior Court

Trial Judge: Hon. Patrick M. Broderick

Counsel:

Law Offices of Tiffany Gates, Tiffany Gates; Flahavan Law Officers, Brian Thomas Flahavan; Henderson Law, Michael Henderson for Plaintiff and Appellant.


Orbach Huff & Henderson LLP, Kevin E. Gilbert and Nicholas Daniel Fine, Eric W. Danly, City Attorney, Jordan Mitchel Green, Assistant City Attorney for Defendants and Respondents.